1  Glenn Katon SBN 281841
2  KATON.LAW
   385 Grand Avenue, Suite 200
3  Oakland, CA 94705
   gkaton@katon.law
4  (510) 463-3350
   (510) 463-3349 (fax)
5
6  ATTORNEY FOR PLAINTIFFS
7
8
9
10
11                  UNITED STATES DISTRICT COURT
12                 NORTHERN DISTRICT OF CALIFORNIA
13
14  CALIFORNIA PARENTS FOR THE          Case No.
    EQUALIZATION OF EDUCATIONAL
15  MATERIALS; ARVIND RAGHAVAN,
    individually and as parent and next friend   **COMPLAINT**
16  of M.R. and N.R.; VISHNUKUMAR
    THUMATI, individually and as parent and
17  next friend of P.T. and N.T.; SHAILESH
    SHILWANT, individually and as parent
18  and next friend of P.S. and P.S.S.,
19              Plaintiffs,
20       v.
21
    TOM TORLAKSON, in his official
22  capacity as State Superintendent of Public
    Instruction and Director of Education for
23  the California Department of Education;
    TOM ADAMS, in his official capacity as
24  Deputy Superintendent of the Instruction
    and Learning Support Branch of the
25  California Department of Education;
    STEPHANIE GREGSON, in her official
26  capacity as Director of the Curriculum
    Frameworks and Instructional Resources
27  Division of the California Department of
    Education; MICHAEL KIRST, ILENE
28  STRAUS, SUE BURR, BRUCE

                          COMPLAINT – Page 1

1   HOLADAY, FELIZA I. ORTIZ-LICON,
    PATRICIA ANN RUCKER, NICOLASA
2   SANDOVAL, TING L. SUN, and TRISH
    BOYD WILLIAMS, each in their official
3   capacity as a member of the California
    State Board of Education; MYONG
4   LEIGH, in his official capacity as Interim
    Superintendent of the San Francisco
5   Unified School District; SHAMANN
    WALTON, HYDRA MENDOZA-
6   MCDONNELL, STEVON COOK, MATT
    HANEY, EMILY M. MURASE, RACHEL
7   NORTON, and MARK SANCHEZ, each
    in their official capacity as a member of the
8   San Francisco Unified School District
    Board of Education; RICK SCHMITT, in
9   his official capacity as Superintendent of
    the San Ramon Valley Unified School
10  District; MARK JEWETT, KEN MINTZ,
    RACHEL HURD, DENISE JENNISON,
11  and GREG MARVEL, each in their official
    capacity as a member of the San Ramon
12  Valley Unified School District Board of
    Education; WENDY GUDALEWICZ, in
13  her official capacity as Superintendent of
    the Cupertino Union School District;
14  ANJALI KAUSAR, LIANG CHAO,
    KRISTEN LYN, SOMA McCANDLESS,
15  and PHYLLIS VOGEL, each in their
    official capacity as a member of the
16  Cupertino Union School District Board of
    Education; CHERYL JORDAN, in her
17  official capacity as Superintendent of the
    Milpitas Unified School District; DANIEL
18  BOBAY, DANNY LAU, CHRIS
    NORWOOD, HON LIEN, and ROBERT
19  JUNG, each in their official capacity as a
    member of the Milpitas Unified School
20  District Board of Education,

21              Defendants.

22

23          **I.   NATURE OF THE CASE**

24      1.   Plaintiffs challenge the unfair and unconstitutional treatment of Hinduism and the

25  endorsement of the Abrahamic faiths in California's public school curriculum.

26      2.   Defendants have adopted and are implementing content standards and a

27  curriculum framework that are the foundation of the history-social science education provided to

28

all California public school students. The content standards, adopted by the State Board of Education (SBE) in 1998, explain the teachings of major world religions, their virtues and central figures, and the belief of adherents in the divine origins of their faiths. This is true for all religions covered except Hinduism, which is not portrayed as virtuous, does not include mention of religious figures, and is described as an "intellectual tradition" without reference to a belief in divine origins. The content standards also depict biblical events as history without any meaningful historical basis for those events.

3.     The SBE adopted the curriculum framework for history-social science in July 2016 after a drafting and review process that treated Hinduism differently from all other faiths, following recommendations by scholars openly hostile to Hinduism, and rejecting proposed edits that would have aligned the portrayal of Hinduism with that of other religions. The result of a deeply flawed process, the framework adopted by the SBE denigrates Hinduism and endorses the Old and New Testaments of the Bible.

4.     Many parts of the content standards and curriculum framework blatantly disparage Hinduism while others are less emphatic. Like a death by a thousand cuts, the cumulative effect of the curriculum's affronts to Hinduism is severe and affects not just Hindu-American schoolchildren who are treated as outsiders in their own communities, but all California schoolchildren exposed to the disparagement of one of the world's major religions.

5.     One of our nation's fundamental principles is that all people – regardless of where they worship or what they believe – are entitled to equal protection and fair treatment under the law. This longstanding embrace of religious pluralism and respect for diversity has made our country a beacon of hope and a place of refuge for people from all across the globe.

6.     Sadly, we have not always lived up to these lofty ideals. And even today, far too many people in this country face discrimination, harassment, and violence simply because of their

religious beliefs.[1]

## II.    JURISDICTION AND VENUE

7.     The Court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 1331 because it alleges violations of the United States Constitution and 42 U.S.C. § 1983, and therefore raises questions of federal law. Jurisdiction is also based upon 28 U.S.C. § 1343 because relief is sought for the deprivation of Plaintiffs' constitutional rights under color of state law.

8.     Venue is proper in the Northern District of California under 28 U.S.C. § 1391(b)(1), because most defendants reside here and all defendants are residents of California. Venue is also proper here pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims herein have occurred and are continuing to occur in this District.

## III.    PARTIES

### A.    Plaintiffs

9.     California Parents for the Equalization of Educational Materials (CAPEEM) is a California nonprofit corporation based in Fremont, California. It is a membership organization that exists to advance the legal, civil, and religious rights of Hindu-Americans and people of Indian descent in the United States, and promote the fair and accurate portrayal of Hinduism and Indian culture in public educational systems.

10.     Arvind Raghavan is proceeding individually and as parent and next friend of his two children attending school in the Burlingame School District: M.R. in sixth grade and N.R. in fourth grade.

---

[1] This and the preceding paragraph are excerpted from *Combating Religious Discrimination Today: Final Report*, U.S. Department of Justice, July 2016 at 2 (Preface by Vanita Gupta, Principal Deputy Assistant Attorney General, Civil Rights Division, U.S. Department of Justice) (https://www.justice.gov/Combating_Religious_Discrimination).

11.     Vishnukumar Thumati is proceeding individually and as parent and next friend of his two children attending school in the Cupertino Union School District: P.T. in seventh grade and N.T. in second grade.

12.     Shailesh Shilwant is proceeding individually and as parent and next friend of his two children attending school in the Milpitas Unified School District: P.S. in fifth grade and P.S.S. in second grade.

**B.     Defendants**

13.     Tom Torlakson, in his official capacity as State Superintendent of Public Instruction and Director of Education for the California Department of Education.

14.     Tom Adams, in his official capacity as Deputy Superintendent of the Instruction and Learning Support Branch of the California Department of Education.

15.     Stephanie Gregson, in her official capacity as Director of the Curriculum Frameworks and Instructional Resources Division of the California Department of Education.

16.     Each in their official capacity as a member of the California State Board of Education: Michael Kirst, Ilene Straus, Sue Burr, Bruce Holaday, Feliza I. Ortiz-Licon, Patricia Ann Rucker, Nicolasa Sandoval, Ting L. Sun, and Trish Boyd Williams.

17.     Myong Leigh, in his official capacity as Interim Superintendent of the San Francisco Unified School District.

18.     Each in their official capacity as a member of the San Francisco Unified School District Board of Education: Shamann Walton, Hydra Mendoza-McDonnell, Stevon Cook, Matt Haney, Emily M. Murase, Rachel Norton, and Mark Sanchez.

19.     Rick Schmitt, in his official capacity as Superintendent of the San Ramon Valley Unified School District.

20.     Each in their official capacity as a member of the San Ramon Valley Unified

School District Board of Education: Mark Jewett, Ken Mintz, Rachel Hurd, Denise Jennison, and Greg Marvel.

21.     Wendy Gudalewicz, in her official capacity as Superintendent of the Cupertino Union School District.

22.     Each in their official capacity as a member of the Cupertino Union School District Board of Education: Anjali Kausar, Liang Chao, Kristen Lyn, Soma McCandless, and Phyllis Vogel.

23.     Cheryl Jordan, in her official capacity as Superintendent of the Milpitas Unified School District.

24.     Each in their official capacity as a member of the Milpitas Unified School District Board of Education: Daniel Bobay, Danny Lau, Chris Norwood, Hon Lien, and Robert Jung.

### IV.     FACTS

25.     The California Constitution directs the legislature to establish public education. The state's Constitution assures that politics is an integral part of policy making in education through the structure of the bureaucracy it created. Article IX, Section 7, requires the legislature to provide for the appointment or election of the State Board of Education. The legislature has established a ten-member board appointed by the governor for four-year terms subject to senate approval. The SBE drafts and oversees the policies implemented by the California Department of Education (CDE). Among the many responsibilities of the SBE are approving and overseeing statewide curriculum content, creating the curriculum framework for kindergarten through twelfth grade, and adopting instructional materials for kindergarten through eighth grade.

26.     Article IX, Section 2, of the California Constitution provides for the selection of a state superintendent of public instruction in a nonpartisan election. The legislature has designated the superintendent to be the secretary and executive officer of the SBE with responsibility for

executing its policies. The legislature has given the superintendent numerous responsibilities, including working with the SBE to develop and administer state curriculum standards and instructional materials adoption.

**A.**     **Standards**

27.     By statutory mandate, the Commission for the Establishment of Academic Content and Performance Standards developed and recommended the *History–Social Science Content Standards for California Public Schools, Kindergarten Through Grade Twelve* (Standards), which the SBE adopted in October 1998. The Standards provide the content that California public school students need to acquire at each grade level.

28.     The Standards serve as the basis for statewide assessments, curriculum frameworks, instructional materials, professional development, preservice education, and compliance review. In particular, publishers of California public school textbooks must attend to the content and pedagogical requirements specified in the Standards, and textbooks are required to incorporate coverage of all the Standards at the intended grade level.

29.     The Standards cover Hinduism, Judaism, Buddhism and Christianity in the sixth grade and Islam in seventh grade.

30.     State funding for school districts throughout the State of California is contingent upon their determination that each pupil in each school in the school district has sufficient textbooks or instructional materials, or both, that are aligned to the Standards and curriculum frameworks.

31.     Textbooks adopted by school districts throughout the State of California are required to be aligned with the Standards and curriculum frameworks.

32.     Throughout the Standards, the perspective of religions other than Hinduism is provided through each religion's "teachings," which include many virtues and characters central

to those faiths. This is true for Judaism, Buddhism, Christianity, and Islam. Hinduism is not described as virtuous and the Standards do not mention any traditional Hindu characters or narrative.

33.    Judaism, the Standards explain, is "the first monotheistic religion based on the concept of one God who sets down moral laws for humanity," with "ethical teachings" that include "belief in God, observance of law, practice of the concepts of righteousness and justice, and importance of study." They also include the "significance of Abraham, Moses, Naomi, Ruth, David, and Yohanan ben Zaccai in the development of the Jewish religion."

34.    For Buddhism, the Standards require students to "[k]now the life and moral teachings of Buddha," through which they learn about the figure central to the faith and its grounding in morality. Students must also learn about the political and moral achievements of Asoka, a Buddhist emperor.

35.    The Standards require the teaching of Christians' belief in the divine origins of their faith and the narratives of Christianity's central figures: "Note the origins of Christianity in the Jewish Messianic prophecies, the life and teachings of Jesus of Nazareth as described in the New Testament, and the contribution of St. Paul the Apostle to the definition and spread of Christian beliefs (e.g., belief in the Trinity, resurrection, salvation)."

36.    For Islam, the Standards portray a faith that originates in scripture: "Explain the significance of the *Qur'an* and the Sunnah as the primary sources of Islamic beliefs, practice, and law." This is the opposite of how Hinduism is described as derived from people's beliefs and practices.

37.    The Standards describe Hinduism as having "beliefs and practices" with no acknowledgment that Hindus believe their faith is rooted in the divine. The only reference in the Standards to Hindu scripture (the Bhagavad Gita) characterizes it simply as "literature" that is

part of "important aesthetic and intellectual traditions" of India. Such language ascribes worldly origins to Hinduism, whereas the Standards teach the belief in the divine origins of other religions.

38.     The Standards further provide that "the major beliefs and practices of Brahmanism in India . . . evolved into Hinduism." The term "Brahmanism" is offensive to Hindus and has been used historically to insult them, as the term signifies Hinduism as the religion of Aryan priests who were from the brahmin caste.

39.     Concerning Islam, the Standards require students to "[t]race the origins of Islam and the life and teachings of Muhammad, including Islamic teachings on the connection with Judaism and Christianity" and understand "the contributions Muslim scholars made to later civilizations in the areas of science, geography, mathematics, philosophy, medicine, art, and literature." No such understanding is required for Hindu scholars, who have made numerous contributions to mathematics, astronomy, physics, chemistry, medicine, and other fields.

40.     The Standards also disfavor Hinduism and endorse the Abrahamic faiths by depicting parts of the Old Testament of the Bible as history rather than as religious beliefs.

41.     The Standards require students to "[e]xplain the significance of Abraham, Moses, Naomi, Ruth, David, and Yohanan ben Zaccai in the development of the Jewish religion." If such people existed at all, there is no meaningful historical basis upon which to instruct students that they contributed to the development of Judaism. Such instruction teaches religious mythology as history and thereby endorses religions that follow the Old Testament.

42.     The Standards also require students to "[d]iscuss the locations of the settlements and movements of Hebrew peoples, including the Exodus and their movement to and from Egypt, and outline the significance of the Exodus to the Jewish and other people." This requirement teaches religious stories as history without any meaningful historical basis and thereby endorses

religions that follow the Old Testament.

**B.**     **The Framework**

43.     Pursuant to its statutory authority, the California State Board of Education adopted the 2016 History-Social Science Framework (the Framework) on July 14, 2016. The adoption process included several public hearings, part of which were devoted to receiving public comments, and consideration of proposed edits in writing submitted by organizations, academics, and members of the public.

44.     The Framework is required to be aligned with the Standards and follow the guidelines listed in the *Curriculum Framework and Evaluation Criteria Committee Guidelines for the History-Social Science Framework for California Public Schools, Kindergarten through Grade Twelve* (the Framework Guidelines).

45.     The Framework provides guidance to teachers, administrators, and publishers for the teaching of history and social science. It has two primary audiences: (1) educators, and (2) developers and publishers of curriculum programs and materials. Educators use the Framework as a road map for curriculum and instruction. Publishers of textbooks and other instructional materials must attend to the content and pedagogical requirements specified in the Standards and the Framework. Additional audiences for the Framework include parents, caregivers, families, members of the community, and policymakers, as well as institutions, organizations, and individuals involved in the preparation and ongoing professional learning of educators.

46.     The Instructional Quality Commission (the Commission) is responsible for overseeing the development of the curriculum frameworks. It assigns members to serve on Subject Matter Committees to assist in making recommendations on particular subject matter areas, including history-social science. The Commission also recommends frameworks to the SBE, which is the entity empowered to adopt them.

### 1) *Framework Adoption Process*

47.     In numerous ways, the process leading up to the adoption of the History-Social Science Framework discriminated against Hindus and favored followers of other faiths.

48.     One significant manner in which the Framework adoption process discriminated against Hindus was through the Commission's reliance upon anti-Hindu reports and recommendations submitted by several professors under the name "South Asia Faculty Group." The group submitted to the Commission a review of the proposed Framework dated November 18, 2015, and made further submissions dated February 24, and May 17, 2016.

49.     California law provides a regulatory scheme for the use of Content Review Experts to make recommendations to the Commission and the SBE.[2] This can be done through a Curriculum Framework and Evaluation Criteria Committee to assist in the process of developing a curriculum framework in a particular area and to make a recommendation to the Subject Matter Committee, Commission, and SBE on a curriculum framework.[3]

50.     Content Review Experts must have certain qualifications, receive training and information during publicly noticed meetings, and meet other requirements.[4]

51.     By obtaining and incorporating substantial input on Hinduism from the South Asia Faculty Group, the SBE and the Commission chose to ignore completely the process for consulting content experts contemplated by the Department of Education's regulations. Upon information and belief, the Commission did not rely comparably on the report of an outside faculty group for any content area other than Hinduism and Ancient India.

52.     Perhaps more importantly, as set forth below, the South Asia Faculty Group report is patently anti-Hindu and should have been rejected by the Commission on that basis alone. The

---

[2] 5 C.C.R. § 9511.
[3] *Id.* § 9511(b).
[4] *Id.* § 9511(h),(k); § 9512(e),(h).

anti-Hindu bias of Professor Jonathan Kenoyer, who, upon information and belief, wrote or was the principal author of the report, was well known to Defendant Tom Adams, then Executive Director of the Commission, and likely other members of the Commission.

53.     In 2005, the Commission, then known as the Curriculum Commission, rejected a textbook Kenoyer co-authored by a 14-0 vote because it "include[d] language and examples that [were] derogatory, accusatory, or instill[ed] prejudice against" Hinduism. That textbook mocked Hinduism, asking students (when discussing the Hindu epic Ramayana): "[t]he monkey king Hanuman loved Rama so much that it is said that he is present every time the Ramayana is told. So look around—see any monkeys?" Kenoyer and several other people whose names appear on the SAFG Report also signed onto an anti-Hindu letter from Professor Michael Witzel to the SBE in 2005.[5]

54.     The SAFG Report made several dozen comments on and recommended edits to the draft of Framework under consideration at that time. Not one reflected positively on Hindus. Many were disparaging to Hindus and Hinduism. Some, though far from all, of the efforts to diminish Hinduism in the report that was exalted by the Commission are enumerated below.

55.     A section of the Framework on "The Early Civilizations of India," posed the question "How did the religion of Hinduism support individuals, rulers, and societies?" The SAFG Report recommended removing the reference to Hinduism and substituting "the religion of Ancient India."

56.     A draft of the Framework stated about Hindu women: "They participated equally with their husbands in religious ceremonies and festival celebrations." The SAFG Report recommended changing this to the opposite claim: "They participated in religious ceremonies and

---

[5] *See California Parents for the Equalization of Educational Materials (CAPEEM) v. Noonan*, 600 F. Supp.2d 1088, 1099, 1113 (E.D. Cal. 2009) (describing Witzel letter among other evidence adduced by plaintiff that required denial of defendants' motion for summary judgment).

festival celebrations, though not as equals."

57.     A draft of the Framework provided: "Many of the central practices of Hinduism today, including home and temple worship, yoga and meditation, rites of passage (samskaras), festivals, pilgrimage, respect for saints and gurus, and, above all, a profound acceptance of religious diversity, developed over this period." The SAFG Report recommended deleting "profound acceptance for religious diversity" from the sentence.

58.     To the sentence of the Framework noting that: "Today many Hindus, in India and in the United States, do not identify themselves explicitly as belonging to a caste," the SAFG Report recommended adding at the end "but may do so implicitly."

59.     In discussing the question "How did the religion of Buddhism support individuals, rulers, and societies?" the Framework provided: "Through the story of [the Buddha's] life, his Hindu background, and his search for enlightenment, students may learn about his fundamental ideas: suffering, compassion, and mindfulness." The SAFG Report recommended deleting "Hindu background" from the sentence. The rationale for its suggestion – that "nothing called Hinduism existed at this moment in time" – is flatly inconsistent with other SAFG Report suggestions that references to "India" and "ancient India" be replaced with "South Asia" and "Pakistan," since no places existed with those names during the entire period addressed by the sixth and seventh grade Framework, which is supposed to be "Ancient Civilizations" and "Medieval and Early Modern Times."

60.     In a discussion on immigration to the United States in the late nineteenth and early twentieth centuries, the Framework noted: "California also came to play an increasingly significant role in the national economy. The Gold Rush in California, the building of the transcontinental railroad, and agricultural labor in Hawaii and the mainland spurred Chinese, Korean, Japanese, Filipino, Hindu, and Sikh immigration to the United States." The SAFG Report

recommended replacing "Hindu, and Sikh" with "South Asian (mostly Sikh)."

61.     The Commission's use of the bigoted SAFG Report coincided with its shell game of not identifying experts it would consult on the Framework's depiction of Hinduism during the drafting and editing process. California law provides for a fundamentally open and deliberative process leading up to the adoption of the curriculum Framework. The Commission subverted that process, as described below, by consulting undisclosed content experts in secret, and evading questions from the public about how expert consultation was being conducted. Upon information and belief, the Commission went to elaborate lengths to hide its consultations with secret experts only with respect to Hinduism and did not do so for its depiction of other religions.

62.     During the September 17, 2014 Commission meeting, then-Commissioner Nancy McTygue announced that the California History-Social Science Project (CHSSP) had an extensive team of scholars and writers prepare drafts of the Framework. At the time, McTygue was, in addition to being a member of the Instructional Quality Commission, Executive Director of CHSSP, so she obviously had access to the scholars and writers to whom she referred. However, neither McTygue nor the other members of the Commission revealed to the public who the scholars and writers were.

63.     On September 22, 2014, Defendant Tom Adams explained by email message that the Commission's use of experts would depend on who was available and willing to participate but that CDE would not be contracting with any experts. He also claimed all comments from experts would be treated as public comments.

64.     During the Commission's December 18, 2014 meeting of the History–Social Science Subject Matter Committee, McTygue again referred several times to unnamed scholars the Commission consulted, some from what she called "my network." Upon information and belief, McTygue and other Commissioners conducted their secret consultations with scholars to

avoid public scrutiny and advance their personal anti-Hindu views.

65.     During the Commission's February 6, 2015 meeting, Defendant Adams repeatedly evaded questions raised by a Hindu parent about whether the process of hiring experts would be an open one. Upon information and belief, Adams deliberately avoided addressing the openness of the process to avoid public scrutiny and advance his personal anti-Hindu views.

66.     During the Commission's May 8, 2015 meeting of the History-Social Science Subject Matter Committee, Adams announced that experts would be hired to review the public comments received in the process to review the History-Social Science Framework.

67.     On August 27, 2015, when asked twice by email for information about the experts the Commission was consulting, Adams ignored the questions and responded that "The experts will be used by the IQC and SBE will have to apply via an application and appointed by the SBE. The decision of whether experts are needed will be decided after the October 8-9 meeting." No expert applications were accepted by the SBE and no experts were appointed.

68.     Upon information and belief, Adams sent the incoherent message quoted in the preceding paragraph without answering the questions about the identity of the experts the Commission was already consulting on Hinduism to keep the Commission's deliberations behind closed doors and advance his personal anti-Hindu views.

69.     Members of the Commission knew or should have known that Adams was involved heavily in the SBE's violation of California's Administrative Procedures Act in its consideration of content relating to Hinduism during the SBE's last textbook adoption process. *See Hindu American Foundation v. California State Board of Education*, (Super. Ct. Sacramento County, Sept. 1, 2006, No. 06 CS 00386).

70.     Defendant Adams collaborated previously with the virulently anti-Hindu professor Michael Witzel to demean Hindus in California textbooks. During the last textbook approval

process, Adams orchestrated Witzel's submission of a letter to the State Board of Education objecting to the Curriculum Commission's revisions to textbooks favorable to Hindus even though Witzel had no knowledge of what those revisions were. Adams used this letter to persuade the SBE to reverse the Curriculum Commission's recommendations and only then shared the revisions with Witzel.

71.    Adams also called a woman's comments on the depiction of Hindus in textbooks a "nationalist interpretation of Indian history," even though the woman was from the United States, and Adams did not think she was of Indian descent.[6]

72.    The Commission announced at its October 9, 2015 History–Social Science Subject Matter Committee meeting that it would not seek applications for an expert panel to review the draft Framework. Thus, the Commission continued to take input from scholars privately and through the public comments it received in writing and at hearings, without using the formal process for expert retention.

73.    The March 24, 2016 History–Social Science Subject Matter Committee Meeting revealed the exalted treatment the Commission gave the South Asia Faculty Group recommendations and the lack of effort made to consult with historians who did not hold the anti-Hindu bias of that group's submissions. Nancy McTygue extolled the credentials of the South Asia Faculty Group and claimed "we did not have access to this level of scholarship previously," a statement belied by her earlier claims of having access to "wonderful scholars." She neither articulated any effort to obtain input that was not outwardly anti-Hindu nor did she explain why the Commission had refused offers of assistance to recruit eminent historians who would not have an anti-Hindu agenda.

---

[6] *CAPEEM*, 600 F. Supp.2d at 1113.

74.     Further, on numerous occasions during the March 24 meeting described in the preceding paragraph, McTygue indicated that she did not know the basis for the South Asia Faculty Group recommendations; yet she recommended that the Commission follow them blindly. Her responses to questions from the Commission included:

> "I don't pretend to have the capacity to answer that – in the level of detail, but I do defer to their expertise on this,"

> "I would argue that, um, we would defer to scholars on this topic – we don't have the capacity to answer that level of specificity on this question,"

> "I can't answer that specific question for you – I wish that I could tell you that I have that level of knowledge but I don't personally have that."

75.     The disfavored treatment Hinduism received in the Framework adoption process can also be seen in the disparate treatment the Commission gave to changes sought by other religious groups. While the insider's perspective (the believer's perspective) was reflected in the Framework for other religious groups, Hinduism was the sole religion that was described through the outsider's perspective.

76.     When a Christian group, Gateways to Better Education, requested the change from Jesus promising "eternal salvation to believers," to Jesus adding "the promise of eternal salvation to those who believe in him as their Savior," the request was granted without any scrutiny from experts.[7] This change emphasized the insider perspective given to Christianity, while the Commission rejected numerous comparable edits with respect to Hinduism.

77.     The Institute for Curriculum Services (ICS), part of the Jewish Community Relations Council, objected to the following reference to the good Samaritan parable included in a draft of the Framework:

> Through selections from Biblical literature, such as the Sermon on the Mount and the parables of the Good Samaritan, the lost sheep, and the Prodigal Son, the students will learn about those teachings of Jesus that advocate compassion,

---

[7] The adopted version removed the capitalization of "Savior."

justice, and love for others.

78.     The ICS explained the rationale for its objection:

The parable of the Good Samaritan, which describes Jews as biased and heartless,
should not be used. The Institute for Curriculum Services raised this concern
during the 2009 revision of the Framework, and the Curriculum Framework and
the Criteria Committee accepted ICS's recommendation to remove this in June
2009. It is worth noting that the text approved at that time was very similar to
ICS's current recommendation in that it includes reference to Biblical literature
and what students can learn about the teachings of Jesus from them, without
getting into specifics. Parables that demean one religion are not appropriate for a
History Framework for California public school students. Category 1.10 of the
History–Social Science SMC's Criteria for Evaluating Instructional Material
disallows their use.[8]

79.     At the SBE's July 14, 2016 meeting, it adopted the exact edit proposed by ICS:

Through selections from Biblical literature, ~~such as the Sermon on the Mount and
the parables of the Good Samaritan, the lost sheep, and the Prodigal Son, the~~
students will learn about those teachings of Jesus that advocate compassion,
justice, and love for others.

80.     By stark contrast, the Commission added language derisive of Hinduism then
refused requests to remove it. An interim draft of the Framework provided:

---

[8] Category 1.10 of the Criteria for Evaluating Instructional Materials: Kindergarten Through
Grade Eight provides:

Materials on religious subject matter remain neutral; do not advocate one religion
over another; do not include simulation or role playing of religious ceremonies or
beliefs; do not include derogatory language about a religion or use examples from
sacred texts or other religious literature that are derogatory, accusatory, or instill
prejudice against other religions or those who believe in other religions. Religious
matters, both belief and nonbelief, must be treated respectfully and be explained as
protected by the U.S. Constitution. Instructional materials, where appropriate and
called for in the standards, include examples of religious and secular thinkers in
history. When the standards call for explanation of belief systems, they are
presented in historical context. Events and figures detailed in religious texts are
presented as beliefs held by members of that religion, are clearly identified as
such, and should not be presented as fact unless there is independent historical
evidence justifying that presentation. All materials must be in accordance with the
guidance provided in the updated History–Social Science Framework, Appendix
C, "Religion and the Teaching of History–Social Science," and Education Code
sections 51500, 51501, 51511, and 51513.

Today many Hindus, in India and in the United States, do not identify themselves as belonging to a caste. Teachers should make clear to students that this was a social and cultural structure rather than a religious belief.

81.     The Commission later changed that language to reach the opposite conclusion about the connection of caste to Hinduism (based upon the recommendation of the SAFG Report):

Today many Hindus, in India and in the United States, do not identify themselves as belonging to a caste. Teachers should make clear to students that this was a social and cultural structure as well as a religious belief.

82.     Many would argue that caste was not and is not a Hindu belief.[9] But irrespective of the accuracy of the language, it is certainly derogatory and inconsistent with the SBE's Criteria for Evaluating Instructional Materials, the Framework Guidelines, and the treatment of other religions in the Framework.

83.     The Commission's treatment of the ICS edit seeking removal of the good Samaritan parable from the section on Christianity on the grounds that it demeaned Judaism also contrasts with the treatment of edits sought by Hindu groups that wanted to remove implied negative statements on Hinduism in the section on Sikhism. After equating brahmins and caste with Hinduism in an earlier chapter, the Framework describes the origin of Sikhism as: "Sikhism was founded by Guru Nanak, a social reformer who challenged the authority of the Brahmins and the caste order." The Commission rejected many proposed edits from Hindu groups that would have changed the problematic characterization of Sikhism as a "challenge" to Hinduism.

84.     By letter submitted in May 2016, scholars calling themselves the Social Sciences and Religion Faculty Group provided the Commission with an incisive analysis of the discriminatory treatment Hinduism was receiving, by reference to a suggested edit regarding caste as a Hindu religious belief. The Commission rejected the group's recommendations:

---

[9] *See infra* ¶¶ 99-101.

The [edit] is a matter of equity in the discussion of religions in 6th and 7th grade textbooks. The Content Standards for each civilization covered in the 6th and 7th grade specifically state that, "Students analyze the geographic, political, economic, religious and social structures of the early civilizations of _____." But this is done quite selectively, with no mention of social structure in the discussion of other religions in the same way as for Hinduism and India. The result has been that the actual textbook chapters that cover Hinduism are almost entirely focused on caste, as if that were the essence of the Hindu religion. It is our intention here to create a more balanced narrative, as compared with other religions.

In that regard, matters of social equity must be considered, especially if Hinduism is not being viewed from the same lens as other world religions covered in the framework narrative. For example, well-worn scholarship has revealed that hierarchical views in Christianity supported the subjugation of native peoples and the practice of slavery, and we still live with the inequality that sprang from that today, even if, later, Christians began to oppose such practices. Certainly, scriptures and saints of Hinduism, Christianity, and Islam have addressed negative social issues. But it is quite another matter to say any of them created a religious mandate.

Consequently, we suggest that if the revised Framework narrative is silent on negative social structures involving other religions, it ought to similarly represent Hinduism without such tendencies. Conversely, if the IQC and Board deem it necessary to highlight negative interpretations of social issues and attribute them to Hinduism, then it should do so across all of the sociohistorical accounts of the other world religions, as well.

85.     The Commission was made acutely aware of the pain and humiliation the curriculum's portrayal of Hinduism inflicts on Hindu students. A Hindu student provided the Commission with an account of how her class was taught about the caste system two years prior:

Sixth grade was the first time I was to learn about my culture in school, so at first I was excited. However, I was surprised to see that the lesson was so short and had nothing I knew to be my religion or heritage.

Because the caste system was mentioned so many times, our teacher created a simulation in our class, in which we were put into four major caste groups. Each student was given a worksheet to complete by the end of the period. However, a higher caste could take advantage of a lower caste by asking them for the answers, and the lower caste was forced to give it to them. By the end of the period, a majority of the class was complaining of how unfair this is, and how cruel this Hindu system was.

In fact, I had never even known what my caste was, until the textbook brought it up, as my parents and relatives didn't render it important for my cultural learning. I have many Hindu friends and I do not know any of their caste. However, my

1  classmates and teacher think we, Hindus, still believe in primitive and unjust
2  practices.

3  Standards for evaluating History Social Science clearly states its purpose as to
   "enable all students to become aware and accepting of religious diversity while
4  being allowed to remain secure in any religious beliefs they may already have."

5  But the experience that I had clearly shows that my class was not helped to
6  become aware and accepting of my heritage nor was I allowed to remain secure in
   my belief. I do not want my friends to look down upon me and my culture and
7  religion because of my textbook. This is unfair.

8  We know that social hierarchies have existed in all societies, so why is Hinduism
   singled out with such negative portrayal?
9

10  What I request is fairness and dignity. Is that too much to ask for? I'm asking for
    the textbooks to focus on the positive aspects of Hinduism, and not focus on only
11  negative. Thank you.

12         86.     Another change to the Framework made out of sensitivity shown to a religious

13  faith that was not extended to Hindus came through the deletion of the following sentence that

14  Commissioner Bill Honig explained at the July 2016 SBE meeting would make the language

15  acceptable with respect to Islam:
16
       After 1000 CE, Turks from Central Asia, who were recent converts to Islam,
17     began to conquer new territory and expand their boundaries across the Indus
       Valley to parts of the northern Indian plains. ~~Sometimes Turkish Muslim leaders~~
18     ~~forced Hindus to convert, but at other times rulers practiced religious toleration.~~
19     The most powerful of these states was the Delhi Sultanate.

20         87.     The SBE also rejected suggested changes to the Framework that would have made

21  the treatment of Hinduism more comparable to that received by other religions.

22         88.     Although virtually none of the Framework explains Hindus' belief in the divine
23
    origins of their faith, the SBE rejected a change proposed by CAPEEM to the sentence "Ancient
24
    India experienced a Vedic period (ca. 1500-500 BCE), named for the Vedas which were
25
    composed in Sanskrit" so it would read: "According to Hindu tradition, *rishis* or sages received
26
27  revelations, which were composed and known as the Vedas."

28

89.     The change sought in the preceding paragraph would have made the Framework's depiction of Hinduism more consistent with that of Christianity, which begins its description of Jesus as: "According to the New Testament of the Christian Bible, Jesus, a Jewish carpenter from the small Judean city of Nazareth, began to preach a message of peace and divine salvation through love." Similarly, the Framework's depiction of Islam provides: "According to Muslim tradition, Muhammad, an Arabic-speaking merchant, received revelations from God, which were written down in the *Qur'an*."

90.     The SBE also rejected a change suggested by CAPEEM of the sentence "By examining selections from the Analects, or "sayings" of Confucius, students learn that, as with Socrates and Jesus, his ideas were written down by others at a later time" to "By examining selections from the Analects, or "sayings" of Confucius, students learn that, as with Hindu sages, Buddha, Socrates and Jesus, his ideas were written down by others at a later time."

91.     The Framework Guidelines require keeping the basic goals of the 2005 edition of the History-Social Science Framework, one of which provides: "[Students] should take pride in their own cultural heritages, and should develop a multicultural perspective that respects the human dignity of all people and an understanding of different cultures and ways of life." This goal was met for every religious culture except Hinduism.

92.     The inferior treatment given to Hindus and Hinduism during the Framework adoption process stigmatized and humiliated Plaintiffs. This second-class treatment prevented them from participating as full members of the community.

### 2) Framework Substance

93.     The substance of the Framework denigrates Hinduism in many ways and endorses the religious doctrine of other faiths regardless of the discriminatory process through which it was developed and adopted.

94.     The Framework covers Hinduism, Judaism, Buddhism and Jainism in sixth grade;
Christianity, Islam, Sikhism and modern movements in Hinduism in seventh grade; contributions
of Sikhs in fourth grade; and, in tenth grade, the purported benefit to Hindus of Christian
colonization in India.

95.     The Framework denigrates Hinduism by asserting that: "In [the Vedic period],
Vedic culture emerged as a belief system that combined the beliefs of Indic speakers with those
of older populations." The "Vedic period" and "Vedic culture" are tantamount to references to
Hinduism, since they represent the creation of the Vedas, the earliest Hindu scripture. To suggest
that a "culture emerged as a belief system" strips the Hindu belief system of any divine origins - it
depicts the religion simply a social construct. The Framework does not explain other religions in
sociological and anthropological terms; rather, it explains them as they are understood by
followers of those faiths.

96.     In addition, the Framework reference to "Indic speakers" quoted in the preceding
paragraph is to the language spoken by an Indo-Aryan people who are part of the highly
controversial Aryan Invasion Theory. That theory of Aryans invading or migrating to South Asia
to "civilize" it is expressly embraced in the Standards and is referenced throughout the
Framework. The origins of all other religions included in the Framework are explained from the
perspective of the believer and not the skeptic. Only for the origin of Hinduism does the
Framework use a discredited theory that is, at best, highly controversial and offensive to most
Hindus.

97.     Instead of simply explaining Hindu beliefs as to the origins of the religion prefaced
by "according to Hindu tradition" as is done for other explanations throughout the Framework,
Hinduism is explained in convoluted terms that focus on people who delivered religious messages
rather than the messages themselves, which Hindus believe to be divine: "Brahmins, that is,

priestly families, assumed authority over complex devotional rituals, but many important sages, such as Valmiki and Vyasa, were not brahmins. Ancient Hindu sages (brahmins and others) expounded the idea of the oneness of all living things and of Brahman as the divine principle of being."

98.     By contrast, for example, the Framework explains the origins of Islam as: "According to Muslim tradition, Muhammad, an Arabic-speaking merchant, received revelations from God, which were written down in the *Qur'an*. This message declared that human beings must worship and live by the teachings of the one God and treat one another with equality and justice."

99.     The Framework also unfairly attributes the caste system to Hinduism: "Today many Hindus, in India and in the United States, do not identify themselves as belonging to a caste. Teachers should make clear to students that this was a social and cultural structure *as well as a religious belief* (emphasis added)." It also blames Hindu "priests, rulers, and other elites" who "used religion to justify the social hierarchy."

100.     Of the 75 lines in the Framework that constitute the central discussion of Hinduism, 32 lines are devoted to discussing caste. Thus, 43 percent of what students learn about Hinduism relates to an unfair societal structure that the Framework has told them is part of that religion.

101.     For no other religion besides Hinduism does the Framework describe supposed negative beliefs of followers based upon the Commission's interpretation of religious text.[10] The Framework also fails to note that the caste system has existed in India among Sikhs, Christians, Muslims and Buddhists, but has not existed among Hindus of Indonesia and Fiji.

---

[10] For example, interpretations of the Bible and the Quran that deem same-sex relationships a sin are, understandably, omitted from the Framework.

102.    The Framework further describes Hinduism as a negative influence on then-existing societal norms while describing other religions as a positive influence on negative aspects of society. For example, Hinduism is described as contributing to the unequal status of women while discussing the topic of patriarchy, while other religions are described as ameliorating the problem of the unequal status of women that existed in society. The Framework does not address interpretations of the Bible that would give women a status inferior to men.

103.    Similarly, the Framework blames Hindu priests for problems in society while exonerating the Christian priestly class of blame for causing conflicts. Specifically, the Framework claims that Hindu priests, rulers, and other elites justified the caste system by asserting that they "used religion to justify the social hierarchy." In the case of Christianity, according to an earlier draft of the Framework: "Students may investigate the significance of conflict between popes who claimed political supremacy in Europe and secular monarchs who successfully resisted it." This language was changed to remove the description of popes seeking political supremacy. The sentence now reads: "Around 900, popes began to assert their control over the church hierarchy, which brought them into conflict with secular monarchs."

104.    The Framework further disfavors Hinduism, other faiths, and nonbelievers by endorsing Old and New Testament religious doctrine and depicting biblical stories as history.

105.    The Framework teaches that the early traditions of Jews originated the observance of law, the practice of righteousness and compassion, and the belief in one God, as if it were a fact of history that those practices and beliefs had never existed before.

106.    Jewish religious doctrine is endorsed by the Framework by portraying the Exodus from Egypt has an historical event – one that was "of great significance to Jewish law and belief, especially the concept of a special relationship or covenant between the Israelites and God." In fact, historians do not consider the Exodus an historical event.

107.    The Framework further provides: "After the Exodus, Saul, David, and Solomon–three successive kings who probably lived in the eleventh and tenth centuries BCE–united the land of Israel into a state. King David enlarged the Kingdom of Israel, established the capital in Jerusalem, was a poet and musician, and is believed to have written many of the Psalms in the Hebrew Bible. King Solomon extended the Kingdom of Israel through many alliances. He is best known for his wisdom, building the First Temple, and writing parts of the Hebrew Bible. After Solomon's reign, the unified kingdom split into two: Israel in the north and Judah (from which we get the words Judaism and Jews) in the south." Again, the Framework depicts ahistorical religious stories as actual history.

108.    The Framework promotes Christian religious doctrine as though it were history by teaching that: "Through selections from Biblical literature, students will learn about those teachings of Jesus that advocate compassion, justice, and love for others. He taught that God loved all his creation, regardless of status or circumstance, and that humans should reflect that love in relations with one another. Jesus shared the Jewish belief in one God, but he added the promise of eternal salvation to those who believe in him as their savior. The Roman authorities in Judea executed Jesus. But under the leadership of his early followers, notably Paul, a Jewish scholar from Anatolia, Christians took advantage of Roman roads and sea lanes to travel widely, preaching to both Jews and others." For no other religion besides Christianity does the Framework provide for students reading scripture.

109.    In addition, by teaching that Mary was the mother of Jesus as though it were historical fact, the Framework endorses Christian religious doctrine.

110.    The Framework describes Christian missionaries who colonized India as benefactors of Hindus:

Colonizers introduced new infrastructures, medicines, educational systems, and cultural norms. Print technology and more rapid transportation aided the growth of

organized religion. These technological developments also facilitated integration of regional Indian religious traditions into the larger religious tradition of the subcontinent while still retaining their regional identity. Christian missionaries made use of colonial institutions and infrastructure to educate and evangelize native peoples, helping to broaden Christian presence around the world. Some European thinkers joined religious beliefs to Social Darwinian ideas about the evolution of races, leading to European efforts to "civilize" native peoples they perceived as "backward." They also attempted to reform practices involving marriage and women's social roles.

111.    The phrase "larger religious traditions of the subcontinent" in the excerpt in the preceding paragraph is a euphemism for Hinduism. No other religion besides Hinduism is described in the Framework as benefiting from colonialism and no other religious group besides Christians is described in positive terms for its negative actions such as colonizing people. Indeed, this part of the Framework is inconsistent with the requirement of the Standard 10.4.3 that the perspective of the colonized be provided along with that of the colonizers.

**C.    School Districts**

112.    Plaintiffs do not challenge the right of school districts to decide their curricula as provided by California law. Rather, Plaintiffs challenge the school district Defendants' incorporation into their curricula the unconstitutional portions of the Standards and Framework set forth in this Complaint.

113.    San Francisco Unified School District (SF USD) uses textbooks or instructional materials, or both, that are aligned to the Standards and that are consistent with the Framework. Its history-social science curriculum that is rooted in the Standards and Framework denigrates Hindus and endorses the Abrahamic faiths.

114.    San Ramon Valley Unified School District (San Ramon Valley USD) has adopted the Standards and its curriculum is aligned with the Standards and Framework. San Ramon Valley USD's history-social science curriculum that is rooted in the Standards and Framework denigrates Hindus and endorses the Abrahamic faiths.

115.   Cupertino Union School District (Cupertino Union SD) uses textbooks or instructional materials, or both, that are aligned to the Standards and that are consistent with the Framework. Cupertino Union SD's history-social science curriculum that is rooted in the Standards and Framework denigrates Hindus and endorses the Abrahamic faiths.

116.   Milpitas Unified School District's (Milpitas USD) curriculum is aligned with the Standards and Framework and it implements the Standards and Framework in its instructional materials. Also, "demonstrated knowledge of the curriculum framework for the subject and the specific content of the district's course of study for the subject at the grade level to be taught" is a criterion for teacher assessment in certain circumstances. Milpitas USD's history-social science curriculum that is rooted in the Standards and Framework denigrates Hindus and endorses the Abrahamic faiths.

**D.     Injuries to Plaintiffs**

117.   CAPEEM as an organization has been injured by Defendants' constitutional violations. It has diverted resources from other activities to organize California parents of public school students to advocate for a fair and accurate depiction of Hinduism in the state curriculum. CAPEEM continues this organizing and advocacy and must contend now with the textbook adoption process, which requires adherence to the unconstitutional Standards and Framework. CAPEEM is also developing and will distribute supplemental materials for California school districts that provide a fair and accurate depiction of Hinduism, to try to reduce the impact of the disfavored treatment the religion receives in the current curriculum. As a direct result of the effort necessary to address the discriminatory Standards and Framework, CAPEEM has been unable to engage in many other types of advocacy in and outside of California, such as public education and organizing through speaking engagements and meetings with parents, and policy advocacy through analyses and distribution of those analyses in Hindu communities.

118.   Numerous CAPEEM members have children in public schools throughout Northern California who are taught and otherwise exposed to Defendants' unconstitutional curriculum. They attend every grade, kindergarten through eleven.

119.   At least two children of CAPEEM members attend schools in the SF USD, one in sixth grade and one in third grade.

120.   Four children of CAPEEM members attend schools in the San Ramon Valley USD in the following grades: eleventh, eighth, sixth, and third.

121.   Another CAPEEM member lives in the Cupertino Union SD and has a child in sixth grade and another in kindergarten. He chose to enroll his children in private school in part so they do not have to experience Defendants' discriminatory curriculum.

122.   Plaintiff Raghavan practices Hinduism with his family, including his two children. He is deeply concerned that his children are taught about Hinduism in a negative light, especially when other religions are portrayed only positively, and that some Christian and Jewish traditional beliefs are taught as history without any significant historical basis.

123.   Raghavan has engaged his children in many activities for the purpose, in part, of counterbalancing the biased, negative impression of Hindus and Hinduism his children receive at school. These activities include but are not limited to: buying books on Hinduism and reading them with his children; talking to his children about what they are learning about religion in school and dispelling the misinformation they receive, particularly the privileged position other faiths are given; and taking his children to Bala Vihar, a religious school. If Raghavan were confident that his children were receiving a balanced perspective on religion in their public schools, he would not engage in these activities to the same extent he does now.

124.   Plaintiff Thumati practices Hinduism with his family, including his two children. He is hurt and troubled that the history and social science education his children receive in school

causes his older child to feel Hinduism is inferior, and that the child's interest in and respect for Hinduism are greatly reduced. He fears the same for his younger child.

125.   Thumati tries to undo the harmful impression of Hinduism his children receive in school by explaining to them the rich history of the religion and the positive values it embraces. He teaches them about Hinduism's contributions to medicine, architecture, mathematics, music, yoga, meditation, and ahimsa (non-violence), and its great saints, many of whom were social reformers. He also shows his children videos about the history of Hinduism and takes them to a religious school so they can learn more about their faith than the negative depiction they receive in public school.

126.   Plaintiff Shilwant practices Hinduism with his family, including his two children. He is worried that the schools his children attend teach them that caste and the unfair treatment of women are part of Hinduism. Shilwant's concern is compounded by the fact that women are considered a divine power in Hinduism while other religions have been used to justify slavery and the inferior treatment of women, which the curriculum does not mention. Buddhism, Judaism, Christianity, and Islam are all portrayed positively. The only religion that the Standards and Framework treat negatively is Hinduism.

127.   Both Shilwant's children have started to build an image of Hinduism in their mind that is incorrect and is damaging to their self-esteem. His children trust what they are taught in school. So when he tells his children about the beauty of Hinduism and the contributions it has made to society, it is difficult for them to believe those things since that impression is not reinforced in school.

128.   To compensate for what his children are taught about Hinduism and religion in school, Shilwant buys books for his family to read and discuss about Hinduism, Hindu personalities, and their contributions to society.

129.     Plaintiff Parents and Schoolchildren[11] object to and are injured by Defendants' derision of Hinduism and the curriculum that exposes all California public school students to a discriminatory depiction of their faith. Parents and Schoolchildren further object to and are injured by Defendants' curriculum biased against Hindus that requires students to express a distorted depiction of Hinduism in graded assignments.

130.     Schoolchildren suffer psychological harm, including humiliation and alienation, and receive an inferior education as a direct result Defendants' denigration of Hinduism and exaltation of other faiths.

131.     Defendants' discriminatory and derogatory treatment of Hindus and Hinduism unfairly stigmatizes Parents and Schoolchildren and personally denies them equal treatment under the law.

132.     Defendants' endorsement of Christianity, Judaism, and other faiths sends a message to Parents and Schoolchildren that they are outsiders, not full members of the political community, and an accompanying message to adherents of the faiths Defendants endorse that they are insiders, favored members of the political community.

133.     Plaintiff Parents believe it is their responsibility—not the state's—to provide for their children's religious education. By teaching certain religious doctrines as historical truth and denigrating Hinduism, Defendants' usurp and violate Parents' constitutional rights as parents.

134.     All Plaintiffs also object to, and are injured by, Defendants' use of their tax dollars to provide religious instruction to public-school students that discriminates against Hinduism and endorses the religious teachings of other faiths.

135.     Parents have had to provide tutelage to Schoolchildren to try to ameliorate the anti-

---

[11] "Parents" as used in the complaint means individual Plaintiff parents and members of CAPEEM who are parents of California public schoolchildren. "Schoolchildren" means individual Plaintiff children and the California public schoolchildren of CAPEEM members.

Hindu bias and endorsement of other religions in the curriculum Defendants provide.

## V.     CLAIMS

136.     Defendants' four constitutional violations enumerated below were and continue to be committed under color of state law and are, therefore, actionable under 42 U.S.C. § 1983.

137.     Plaintiffs assert against Defendants the four constitutional claims set forth below based upon the facts alleged in this Complaint, as follows:

CAPEEM, Raghavan, Thumati, and Shilwant v. State Defendants[12]

CAPEEM v. SF USD Defendants

CAPEEM v. San Ramon Valley USD Defendants

CAPEEM and Thumati v. Cupertino Union SD Defendants

Shilwant v. Milpitas USD Defendants

## COUNT ONE
## VIOLATION OF EQUAL PROTECTION CLAUSE OF FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION

138.     CAPEEM's members and the three individual Plaintiffs are Hindu, a protected class under the Equal Protection Clause.

139.     Defendants' Standards discriminate against Hindus by describing Hinduism in derogatory terms and from the perspective of a skeptic, whereas other religions are treated respectfully and described from the perspective of believers who follow those faiths.

140.     Defendants' Framework also discriminates against Hindus by describing Hinduism in derogatory terms and from the perspective of a skeptic, whereas other religions are treated respectfully and described from the perspective of believers who follow those faiths.

141.     The State Defendants discriminated against Plaintiffs in the process leading up to

---

[12] "State Defendants" are Torlakson, Adams, Gregson, Kirst, Straus, Burr, Holaday, Ortiz-Licon, Rucker, Sandoval, Sun, and Williams.

the adoption of the Framework by manipulating the use of experts on Hinduism and South Asia to the disadvantage of all Plaintiffs and considering proposed edits relating to Hinduism on terms different than those given to other religions.

142.    Proposed edits from CAPEEM and other Hindu advocacy organizations and individuals were treated with disfavor compared to proposed edits received from other religious advocacy organizations during the Framework adoption process.

143.    The State Defendants' adoption and all Defendants' implementation of the Standards and Framework was and continues to be intentional.

## COUNT TWO
### VIOLATION OF ESTABLISHMENT CLAUSE OF FIRST AMENDMENT TO THE U.S. CONSTITUTION

144.    Defendants' Standards denigrate Hinduism and endorse the Abrahamic faiths.

145.    The State Defendants' process leading up to the adoption of the Framework disfavored Hinduism and endorsed the Abrahamic faiths.

146.    Defendants' Framework itself denigrates Hinduism and endorses the Abrahamic faiths.

## COUNT THREE
### VIOLATION OF FREE EXERCISE CLAUSE OF FIRST AMENDMENT TO THE U.S. CONSTITUTION

147.    Defendants' Standards denigrate Hinduism and are, therefore, neither neutral with respect to religion nor generally applicable.

148.    The State Defendants' process leading up to the adoption of the Framework disfavored Hinduism and was, therefore, neither neutral with respect to religion nor generally applicable.

149.    Defendants' Framework itself denigrates Hinduism is, therefore, neither neutral with respect to religion nor generally applicable.

1

2

**COUNT FOUR**

VIOLATION OF DUE PROCESS CLAUSE OF FOURTEENTH AMENDMENT TO
THE U.S. CONSTITUTION

3

4

5

6

150.    Defendants' Standards and Framework do not simply provide for an understanding of major world religions in the context of world history. They indoctrinate children with beliefs biased deeply against Hinduism and in favor of the Abrahamic religions.

7

8

151.    Defendants' biased curriculum interferes with the rights of Parents to direct the religious education of their children.

9

10

11

152.    By interfering unreasonably with the liberty interests of parents to direct the upbringing and education of their children, the Standards and Framework violate substantive due process.

12

13

14

**VI.    PRAYER FOR RELIEF**

WHEREFORE the Plaintiffs respectfully request that the Court:

15

16

(a)     Declare that Defendants' actions violate Plaintiffs' rights under the First and Fourteenth Amendments of the United States Constitution;

17

18

19

20

(b)     Enjoin further violations of Plaintiffs' constitutional rights including, but not limited to, an injunction that prohibits Defendants' discrimination against Hindus and their endorsement of the Abrahamic faiths as described in this Complaint;

21

22

23

(c)     Enjoin Defendants from using in all curriculum and instructional materials the portions of the Standards and Framework identified in the Complaint that discriminate against Hindus and endorse the Abrahamic faiths;

24

25

26

27

28

(d)     Award attorney's fees and costs associated with this action; and

1

2          (e)      Award any further relief in favor of Plaintiffs as is just and proper.

3

4
                                        Respectfully submitted,
5
                                        KATON.LAW
6

7                                       /s/ Glenn Katon_____
                                        Glenn Katon
8
                                        ATTORNEY FOR PLAINTIFFS CALIFORNIA
9                                       PARENTS FOR THE EQUALIZATION OF
                                        EDUCATIONAL MATERIALS; ARVIND
10                                      RAGHAVAN, individually and as parent and next
                                        friend of M.R. and N.R.; VISHNUKUMAR THUMATI,
11                                      individually and as parent and next friend of P.T. and
                                        N.T.; SHAILESH SHILWANT, individually and as
12                                      parent and next friend of P.S. and P.S.S.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28