1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CALIFORNIA PARENTS FOR THE
EOUALIZATION OF EDUCATIONAL
MATERIALS, ET AL.,

Plaintiffs,

v.

TOM TORLAKSON, ET AL.,

Defendants.

No. 17-00635-CRB

**ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION TO DISMISS**

Plaintiffs are California Parents for the Equalization of Educational Materials

("CAPEEM"), an organization formed to promote an accurate portrayal of the Hindu religion

in California public schools, as well as several Hindu parents, individually and on behalf of

their school-age children.  See generally Compl. (dkt. 1).  They have brought suit against

several officials at the California Department of Education and members of the State Board

of Education (collectively, "the State Defendants"),[1] as well as four California School

Districts,[2] alleging discrimination against Hinduism in the California public school

---

[1]  The State Defendants are Tom Torlakson (State Superintendent and Director of Education),
Tom Adams (Deputy Superintendent), Stephanie Gregson (Director of the Curriculum Frameworks) and
members of the California State Board of Education: Michael Kirst, Ilene Straus, Sue Burr, Bruce
Holaday, Feliza I. Ortiz-Licon, Patricia Ann Rucker, Nicolasa Sandoval, Ting L. Sun, and Trish Boyd
Williams.  Each is sued in his or her official capacity.

[2]  The parties have stipulated that each of the School District Defendants will not file a
responsive pleading to the complaint or oppose Plaintiffs' claims at this time.  See Stipulations (dkts.
91, 97, 99); Orders granting stipulations (dkts. 90, 96, 98).

curriculum.  Id.  The State Defendants move to dismiss.  See generally MTD (dkt. 88).  The Court hereby GRANTS the motion in part, and DENIES it in part.

## I.     BACKGROUND

The California State Board of Education ("SBE") drafts and oversees the policies implemented by the California Department of Education ("CDE").  Compl. ¶ 25.  The SBE is responsible for approving and overseeing statewide curriculum content, creating the curriculum framework for kindergarten through twelfth grade, and adopting instructional materials for kindergarten through eighth grade.  Id.

In 1998, the SBE adopted the History-Social Science Content Standards for California Public Schools, Kindergarten Through Grade Twelve ("Standards"), which provide an outline of the topics and content that California public school students need to acquire at each grade level.  Id. ¶ 27.  In 2016, the SBE adopted the 2016 History-Social Science Framework ("Framework").  Id. ¶ 43.  The Framework guides teachers, administrators, and publishers in the teaching of history and social science, providing an overview of the historical material corresponding to each of the Standards.  Id. ¶ 45.  Notably, students do not read either the Standards or the Framework.  See id.  But textbooks adopted by school districts across California must be aligned with both.  Id. ¶ 31.

Plaintiffs allege discrimination against the Hindu religion—and endorsement of the Abrahamic faiths[3]—in the Framework adoption process and in the content of both the Standards and the Framework.  Id. ¶¶ 32–42, 47, 93.

Plaintiffs' claim of discrimination in the Framework adoption process is based on the State's alleged reliance on an anti-Hindu report and proposed edits, secret expert consultation with respect to Hinduism but not other religions, and disparate treatment in the State's handling of edits proposed by various religious groups.  Compl. ¶¶ 48–60, 61–74, 75–90. The Framework adoption process included several public hearings, opportunities for public comments, and consideration of proposed edits submitted in writing by organizations,

---

[3] The Abrahamic faiths are Judaism, Christianity, and Islam.

2

academics, and members of the public.  Id. ¶ 43.  During the public comment portion of the

adoption process, a group of history professors under the name "South Asia Faculty Group"

(SAFG) submitted a report on the draft Framework, which included recommended edits.

Id. ¶ 48.  Plaintiffs allege that members of the SAFG have anti-Hindu bias and that SAFG's

report was "patently anti-Hindu," as it recommended edits that were disparaging to Hindus

and Hinduism.  Id. ¶¶ 52–60, 80–83.  Plaintiffs further claim that the SBE gave "exalted

treatment" to the SAFG report.  Id. ¶ 73.

Plaintiffs also allege discrimination against Hindus in the content of the Standards.  Id.

¶¶ 32–42.  They claim, among other things, that unlike its treatment of other religions, the

Standards do not describe Hinduism as virtuous, and make no mention of Hinduism's divine

origins and central figures.  Id.

Finally, Plaintiffs allege discrimination in the content of the Framework.  Id. ¶ 93.

This claim is based on the Framework "unfairly attribut[ing] the caste system to Hinduism"

by teaching that it "was a social and cultural structure as well as a religious belief."  Id. ¶ 99

(emphasis added).  Plaintiffs do not argue that this statement is necessarily false—rather,

they claim that it is a subject of scholarly debate, and assert that "irrespective of the accuracy

of the language, it is certainly derogatory and inconsistent with . . . the treatment of other

religions in the Framework."  Id. ¶82; see also id. ¶ 102 (alleging that the Framework

"describes Hinduism as a negative influence on then-existing societal norms while describing

other religions as a positive influence on negative aspects of society").  Plaintiffs further

allege that the Framework depicts Hinduism as a mere social construct, "strip[ping] the

Hindu belief system of any divine origins," while "endorsing Old and New Testament

religious doctrine [by] depicting biblical stories as history."  Id. ¶¶ 95, 104.

Plaintiffs brought suit in this Court in February 2017, alleging pursuant to 42 U.S.C.

§ 1983 (1) denial of substantive Due Process by interference with the liberty interest of

parents to direct the education of their children; (2) violation of the Establishment Clause of

the First Amendment; (3) violation of the Free Exercise Clause of the First Amendment; and

(4) violation of the Equal Protection Clause of the Fourteenth Amendment. <u>See generally</u> Compl. Plaintiffs seek declaratory and injunctive relief. <u>See id.</u>

State Defendants move to dismiss all claims pursuant to Federal Rule of Civil Procedure 12(b)(6). MTD. Plaintiffs oppose the motion, Opp'n (dkt. 100), and the State Defendants replied in support of their motion, Reply (dkt. 109). Defendants also requested that the Court take judicial notice of the complete text of the Standards and Framework, RJN (dkts. 88–1, 110), and Plaintiffs agree that the Court may do so.[4] Response to RJN (dkt. 100-4). The Court held a motion hearing on June 16, 2017. <u>See</u> Minutes (dkt. 116).

## II.    LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) asserts that the complaint fails to state a claim upon which relief may be granted. Dismissal may be based on either "the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." <u>Balistreri v. Pacifica Police Dep't</u>, 901 F.2d 696, 699 (9th Cir. 1990). For purposes of evaluating a motion to dismiss, a court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." <u>Usher v. City of L.A.</u>, 828 F.2d 556, 561 (9th Cir. 1987). A complaint must plead "enough facts to state a claim to relief that is plausible on its face." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Id.</u>

## III.    DISCUSSION

The State Defendant have filed a motion to dismiss each of the four constitutional claims in the complaint for failure to state a claim. As discussed below, the Court grants the

---

[4] Courts may take judicial notice of undisputed matters of public record. <u>See</u> <u>Lee v. City of Los Angeles</u>, 250 F.3d 668, 690 (9th Cir. 2001). Courts may also consider documents incorporated by reference in the complaint. <u>See</u> <u>Coto Settlement v. Eisenberg</u>, 593 F.3d 1031, 1038 (9th Cir. 2010). The Court takes judicial notice of the Standards and Framework.

1    motion to dismiss with prejudice as to (A) the substantive due process claim, and (B) the

2    Free Exercise claim.  The Court denies the motion as to (C) the Establishment Clause claim.

3    Finally, the Court grants the motion to dismiss with prejudice as to (D) the Equal Protection

4    claim.

5        **A.    Substantive due process claim**

6        Plaintiffs claim that the Standards and Framework violate their substantive due

7    process right under the Fourteenth Amendment by "interfering unreasonably with the liberty

8    interests of parents to direct the upbringing and education of their children[.]"  Compl. ¶ 152.

9    At the hearing, Plaintiffs admitted that their claims fit most squarely under the Equal

10   Protection and Establishment Clauses, not substantive due process, which they included "as a

11   catch-all" to preserve the claim.

12       State Defendants correctly argue that the Ninth Circuit foreclosed the substantive due

13   process claim in Fields v. Palmdale School District, 427 F.3d 1197 (9th Cir. 2005), amended

14   by 447 F.3d 1187 (9th Cir. 2006).  See MTD at 7.  The court held in affirming dismissal of a

15   substantive due process claim that "the constitution does not vest parents with the authority

16   to interfere with a public school's decision as to how it will provide information to its

17   students or what information it will provide." Fields at 1206.  Parents' substantive due

18   process right to direct the education of their children allows them to choose whether to send

19   their children to public or private school, but does not allow them to "dictate the curriculum"

20   in public schools.  Fields at 1205–06.[5]

21       Plaintiffs argue that the holding in Fields is narrow, only applying to sex education in

22   public schools.  See Opp'n at 24.  Plaintiffs are incorrect.  See Fields, 427 F.3d at 1206

23   ("there is no constitutional reason to distinguish [concerns regarding sex education] from any

24   of the countless moral, religious, or philosophical objections that parents might have to other

25   decisions of the School District.").  In the amended Fields opinion, the court made clear that

26   _____

27       [5]  Other circuits are in accord.  See, e.g., Brown v. Hot, Sexy & Safer Prods., Inc., 68 F.3d
     525, 533 (1st Cir. 1995) (parents have no constitutional right to "dictate the curriculum" in a public
28   school); Blau v. Fort Thomas Pub. Sch. Dist., 401 F.3d 381, 395 (6th Cir. 2005) (parents "do not
     have a fundamental right generally to direct how a public school teaches their child."); Leebaert v.
     Harrington, 332 F.3d 134, 141 (2d Cir. 2003) (same)

"the central holding of [its] opinion" is that parents "do not have a fundamental due process right generally to direct how a public school teaches their child" or "to restrict the flow of information in the public schools." Fields, 447 F.3d at 1190 (citations omitted). The holding in Fields therefore applies to school curricula generally, not simply curricula regarding sex education.

Plaintiffs also argue that the amended opinion in Fields allows a claim where the State's violation of the First Amendment infringes the due process right of plaintiff parents.[6] See Opp'n at 25. In fact, the court noted that because the parties made no First Amendment arguments on appeal, the "holding does not . . . consider the limitations that the First Amendment imposes upon the actions of all government agencies, including school boards." Fields, 447 F.3d at 1189–90. That statement simply acknowledged that a parent's inability to mount a substantive due process challenge to public school curricula does not preclude a separate challenge on First Amendment grounds. Indeed, Plaintiffs have raised two such First Amendment claims here.

Because binding Ninth Circuit law establishes that Plaintiffs do not have the substantive due process right they claim here, the Court GRANTS the motion to dismiss this claim, with prejudice.

## B. Free Exercise claim

Plaintiffs claim that the Standards and Framework violate the Free Exercise Clause because they are derogatory towards Hinduism, and students must learn this derogatory depiction. Compl. ¶¶ 147–49. Defendants argue that Plaintiffs fail to state a claim because Plaintiffs have not pled and cannot plead a burden on any religious practice, which is a threshold requirement for a Free Exercise claim. MTD at 8. At the hearing, Plaintiffs admitted that their claims fit most squarely under the Equal Protection and Establishment

---

[6] If Plaintiffs are suggesting a "hybrid-rights" claim here, the argument fails. In Smith, the Supreme Court coined the phrase "hybrid-rights" in suggesting that government action could face heightened scrutiny if it involved "the Free Exercise Clause in conjunction with other constitutional protections." Employment Div., Dep't of Human Res. v. Smith, 494 U.S. 872, 881 (1990). Here there is no substantive due process right to challenge the curriculum in public schools, thus there is no hybrid-rights claim.

Clauses, not the Free Exercise Clause, which they included "as a catch-all" to preserve the claim.

The Free Exercise Clause of the First Amendment bars laws "prohibiting the free exercise [of religion.]" U.S. Const. amend. I. Courts traditionally analyzed Free exercise claims under the balancing test established in <u>Sherbert v. Verner</u>, 374 U.S. 398, 402–03 (1963) (holding that government action which substantially burdens a religious practice must be both justified by a substantial government interest and narrowly tailored to serve that interest). The Court modified the <u>Sherbert</u> test in <u>Employment Division, Oregon Dep't of Human Resources v. Smith</u>, holding that the test did not apply in challenges to laws that are neutral and generally applicable. 494 U.S. 872, 885 (1990), <u>superseded on other grounds by statute</u>. Such laws face rational basis review rather than strict scrutiny. <u>Id.</u> at 879.

"Under the Free Exercise Clause, a law that <u>burdens religious practice</u> need not be justified by a compelling governmental interest if it is neutral and of general applicability." <u>Church of Lukumi Babalu Aye v. City of Hialeah</u>, 508 U.S. 520, 523 (1993) (citing <u>Smith</u>, 494 U.S. 872) (emphasis added). <u>Smith</u> did not remove the preliminary requirement that there be a burden on some religious practice. <u>See id.</u>; <u>accord</u> <u>Parker v. Hurley</u>, 514 F.3d 87, 99 (1st Cir. 2008) (<u>Smith</u> "did not alter the standard constitutional threshold question" of "whether the plaintiff's Free Exercise is interfered with at all.").

The Ninth Circuit has explicitly rejected the argument that after <u>Smith</u>, plaintiffs are not required to demonstrate a substantial burden on their exercise of religion. <u>See</u> <u>Am. Family Ass'n, Inc. v. City & Cty. of S.F.</u>, 277 F.3d 1114, 1123–24 (9th Cir. 2002). In <u>American Family Association</u>, the plaintiff religious group sponsored an advertising campaign espousing the view that homosexuality is a sin, and brought suit when San Francisco adopted a resolution formally denouncing the campaign. <u>Id.</u> at 1118–19. The group alleged that the city's disapproval of its message had a chilling effect on its free exercise of religion. <u>Id.</u> at 1124. The Ninth Circuit affirmed dismissal for failure to state a claim because "a subjective chilling effect on free exercise rights is not sufficient to

constitute a substantial burden" and the "complaint d[id] not otherwise allege any specific religious conduct that was affected by the Defendants' actions." Id.

Plaintiffs claim that the Standards and Framework violate the Free Exercise Clause because they are neither neutral nor generally applicable (and, presumably, do not withstand strict scrutiny). See Compl. ¶ 147. However, Plaintiffs fail to satisfy the threshold requirement—pleading a burden on their Free Exercise. Plaintiffs acknowledge that a Free Exercise claim must be based on regulatory or compulsory government action, Opp'n at 23, but they do not "allege any specific religious conduct that was affected by the Defendants' actions," see American Family, 277 F.3d at 1124. Plaintiffs acknowledged at the hearing that they had not pled a burden on religious exercise "in the sense of worship." Rather, Plaintiffs argue that public school students are required to learn the information described in the Standards and Framework, and that compelling student Plaintiffs to study and be tested on material that is "not neutral on religion and conflicts with their fundamental religious beliefs" violates the Free Exercise Clause. Opp'n at 23–24. But the complaint does not allege that students ever read or even see the Framework. See Compl. ¶ 45 (teachers and textbook developers, not students, are not the Framework's primary audience). Nor are there allegations that student Plaintiffs are prevented from practicing their faith, or that parent Plaintiffs are in any way barred from instructing their children on religion at home.

At its core, Plaintiffs' Free Exercise argument seems to be that the public school curriculum conflicts with their religious beliefs. The Ninth Circuit has held that this alone does not violate the Free Exercise Clause. See American Family, 277 F.3d at 1124; Grove v. Mead Sch. Dist., 753 F.2d 1528, 1534 (9th Cir. 1985)[7] (affirming summary judgment on a Free Exercise claim based on a Plaintiff's objection to an assigned book that offended her religion); accord Parker, 514 F.3d at 99 (affirming dismissal of a Free Exercise claim against a school district, finding no burden on religious exercise when students read a book plaintiffs found religiously offensive). The Ninth Circuit noted that "distinctions must be drawn

_____

[7] Plaintiffs argue that the balancing test described in Grove is no longer good law following Smith, 494 U.S. 872, see Opp'n at 22, but Grove's key holding addresses the threshold question of whether there is any burden on the exercise of religion, which Smith did not change.

8

between those governmental actions that actually interfere with the exercise of religion, and those that merely require or result in exposure to attitudes and outlooks at odds with perspective prompted by religion." Grove, 753 F.2d at 1543 (Canby, J., concurring). "[G]overnmental actions that merely offend . . . religious beliefs do not on that account violate free exercise," and an "actual burden on the profession or exercise of religion is required." Id.

Plaintiffs have not and cannot demonstrate a substantial burden on their religious exercise as required.[8] The Court hereby GRANTS the motion to dismiss this claim with prejudice.

### C.    Establishment Clause claim

Plaintiffs allege that the Standards and Framework violate the Establishment Clause because they denigrate Hinduism and endorse Abrahamic faiths. Compl. ¶ 144.

"The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." Larson v. Valente, 456 U.S. 228, 244 (1982). Governmental action is permissible under the Establishment Clause if (1) it has a secular purpose, (2) the "principle or primary effect" neither advances nor inhibits religion, and (3) it does not foster "excessive state entanglement" with religion. Lemon v. Kurtzman, 403 U.S. 602, 612–13 (1971). If any of the three prongs of this "Lemon test" is not met, the government action violates the First Amendment. Edwards v. Aguillard, 482 U.S. 578, 583 (1987).

The Supreme Court "has long recognized that local school boards have broad discretion in the management of school affairs." Bd. of Educ. v. Pico, 457 U.S. 853, 863 (1982). "Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint," and courts should only intervene if basic

---

[8] Plaintiffs filed a Statement of Recent Decision (dkt. 118) to notify the Court of the Supreme Court's recent decision in Trinity Lutheran Church of Columbia, Inc. v. Comer, No. 15-577, 2017 U.S. LEXIS 4061 (June 26, 2017). In that case, a church-operated preschool brought a Free Exercise claim because it was disqualified from a public benefit solely because of its religious character. Id. at *7. The Supreme Court rejected arguments that there was no burden on the plaintiff's religious exercise, holding that the penalty of disqualification constitutes a burden. Id. at *19–20. There is no such penalty in this case. The Supreme Court's holding does not change this Court's analysis.

1    constitutional values are "directly and sharply implicate[d]." Epperson v. Arkansas, 393 U.S.

2    97, 104 (1968). Balanced against this call for restraint is the Supreme Court's instruction

3    that courts be "particularly vigilant in monitoring compliance with the Establishment Clause

4    in elementary and secondary schools." Edwards, 482 U.S. at 583–84. This is because

5    younger children are more vulnerable to the "subtle coercive pressure in the elementary and

6    secondary public schools." Lee v. Weisman, 505 U.S. 577, 592 (1992); Edwards, 482 U.S.

7    at 584 (stating that the sources of this coercive power are "mandatory attendance, . . .

8    students' emulation of teachers as role models, and the children's susceptibility to peer

9    pressure").

10       The Court evaluates each prong of the Lemon test with this balance in mind.

11       **1.    Lemon Prongs 1 and 3: secular purpose and excessive entanglement**

12       "The purpose prong of the Lemon test asks whether [the] government's actual purpose

13   is to endorse or disapprove of religion." Lynch v. Donnelly, 465 U.S. 668, 690 (1984)

14   (O'Connor, J., concurring). "A reviewing court must be 'reluctant to attribute

15   unconstitutional motives' to government actors in the face of a plausible secular purpose."

16   Kreisner v. City of San Diego, 1 F.3d 775, 782 (9th Cir. 1993) (quoting Mueller v. Allen,

17   463 U.S. 388, 394–95 (1983)). The Supreme Court has long acknowledged that the "study of

18   the Bible or of religion [for its literary and historic qualities], when presented objectively as

19   part of a secular program of education," is consistent with the First Amendment. Sch. Dist.

20   of Abington Twp. v. Schempp, 374 U.S. 203, 225 (1963).

21       Plaintiffs allege that the Standards and Framework endorse the Abrahamic faiths by

22   requiring the teaching of biblical stories as history, Compl. ¶¶ 33, 42, 107, and that "[t]here

23   can be no secular purpose to teaching ahistorical events from scripture as history, which

24   violates the first prong" of the Lemon test, Opp'n at 20. But Plaintiff's claim of a non-

25   secular purpose is implausible, because the text does not support Plaintiffs' allegation that

26   the Standards and Framework teach biblical stories as history. See Shwarz v. United States,

27   234 F.3d 428, 435 (9th Cir. 2000) (the court need not accept as true allegations contradicted

28   by judicially noticeable facts). For example, Plaintiffs argue that the Standards "describe the

Exodus as an historical event," and that the Framework "assigns dates to Exodus and the characters from the Old Testament, ensuring they are considered actual history." Id. The curriculum does not teach the parting of the Red Sea as fact. Rather, it acknowledges the "movement [of Hebrew peoples] to and from Egypt," and notes the "significance to Jewish law and belief" of the Exodus story. See Standards (dkt. 88-3) at 11. The Standards further direct that students be able to "[e]xplain the significance of" figures described in the Old Testament "in the development of the Jewish religion." Id. at 11. Explaining the significance of these figures is not equivalent to "teach[ing] religious mythology as history" as Plaintiffs allege. See Compl. ¶ 41. The curriculum teaches the development of Judaism, not the historical accuracy of biblical stories.

Similarly, the Standards and Framework discuss the historical origins of Christianity, including the life and following of Jesus, without endorsing the Christian belief that Jesus is a divine figure. See Framework (dkt. 88-4) at 74; Standards at 13. Plaintiffs complain that the Framework teaches that Mary was the mother of Jesus "as though it were a historical fact," Compl. ¶ 109. But the Framework makes no reference to the Christian belief in the immaculate conception; it merely states that "[a]lthough ancient Christianity was a patriarchy and all the apostles were men, several women were prominent, especially Mary, mother of Jesus." Framework at 74. This is not a plausible "endorse[ment of] Christian religious doctrine" as Plaintiffs allege. See Compl. ¶ 109.

Nothing before the Court suggests that the State had anything other than a secular purpose—teaching the history of ancient civilizations—in enacting the challenged curriculum. The portions of the text that Plaintiffs cite do not plausibly support any inference of a non-secular purpose, as the Standards and Framework do not teach scripture as fact. See Twombly, 550 U.S. at 570 (allegations in the complaint must be plausible to survive a motion to dismiss). Plaintiffs have not adequately pled a violation of the first prong of the Lemon test.

The third prong of the Lemon test prohibits excessive entanglement with religion. Lemon, 403 U.S. at 612–13. "Cases in which the Supreme Court has found excessive . . .

11

entanglement often involve state aid to organizations or groups affiliated with religious sects, such as parochial schools." Cammack v. Waihee, 932 F.2d 765, 781 (9th Cir. 1991) (citing cases). For this prong, "the questions are whether the involvement is excessive, and whether it is a continuing one calling for official and continuing surveillance leading to an impermissible degree of entanglement." Walz v. Tax Com. of N.Y., 397 U.S. 664, 675 (1970).

The Ninth Circuit held in Brown v. Woodland Joint Unified School District that the adoption and use of curriculum materials in public education is insufficient to constitute excessive entanglement. 27 F.3d 1373, 1383–84 (9th Cir. 1994) (noting that no future monitoring would be necessary). In California Parents for the Equalization of Educational Materials v. Noonan, the same Plaintiff organization currently before this Court challenged textbooks approved by the California State Board of Education as denigrating and discriminatory towards Hinduism.[9] 600 F. Supp. 2d 1088, 1095 (E.D. Cal. 2009). Noonan followed Brown in rejecting CAPEEM's claim that defendants' use of the challenged textbooks fostered an excessive entanglement with religion. 600 F. Supp. 2d at 1122.

Plaintiffs do not and cannot argue that the State's involvement with religion is "excessive" and "continu[ous]," such that it "call[s] for official and continuing surveillance leading to an impermissible degree of entanglement." See Walz, 397 U.S. at 675; Brown, 27 F.3d at 1383–84. They instead argue that the Framework violates the third prong of the Lemon test "by requiring teachers to make clear that the caste system was a Hindu religious belief," as "[s]uch unqualified language is tantamount to a seemingly authoritative interpretation of religious doctrine." Opp'n at 21. Plaintiffs rely on Commack Self-Service Kosher Meats, Inc. v. Weiss, 294 F.3d 415 (2d Cir. 2002), a Second Circuit case. Opp'n at 21–22. Commack found excessive entanglement where a food labeling statute required New York to take an official position on how the term "kosher" should be defined, because the state endorsed the interpretation of one branch of Judaism and rejected that of other branches.

---

[9] The textbooks at issue in that case were required to be aligned with the same Standards challenged here, and the Framework that directly preceded the version challenged in this case. See Noonan, 600 F. Supp. 2d at 1097.

294 F.3d at 425–426.

Unlike in <u>Commack</u>, the challenged curriculum in this case does not "require the State to take an official position on religious doctrine" or "take sides in a religious matter" that is subject to ongoing dispute by different branches within a religion. <u>Id.</u> at 425. The Framework addresses ancient history, not current religious principles. It states that although "[t]oday many Hindus, in India and in the United States, do not identify themselves as belonging to a caste[,]" the caste system was a "social and cultural structure as well as a religious belief" in Ancient India. Compl. ¶ 81. Plaintiffs have not pled that, as in <u>Commack</u>, there are competing interpretations of religious scripture on this issue, nor that the Framework's language requires California to "take sides" in any such debate. <u>See</u> <u>Commack</u>, 294 F.3d at 425. Plaintiffs merely pled that "[m]any would argue that caste was not and is not a Hindu belief." Compl. ¶ 82. This is a question of historical fact, not a matter of religious doctrinal interpretation.

The challenged language here is problematic, as discussed below, but not because it gives an authoritative interpretation of present-day religious doctrine. If there is any entanglement with religion at all, it is not the "excessive and enduring" kind forbidden by <u>Lemon</u>. <u>See</u> 403 U.S. at 619. Plaintiff's claim of excessive entanglement with religion is not "plausible on its face," <u>see</u> <u>Twombly</u>, 550 U.S. at 570, and so Plaintiffs have not adequately pled a violation of the third prong of the <u>Lemon</u> test.

## 2.  **<u>Lemon</u> Prong 2: Primary effect**

The second prong of the <u>Lemon</u> test asks whether the government action has the principal or primary effect of advancing or inhibiting religion. <u>Lemon</u>, 403 U.S. at 612. For challenges to public school education, courts must consider the primary effect of the challenged material within the context of the larger curriculum. <u>Brown</u>, 27 F.3d at 1381. Courts must analyze the primary effect from the perspective of an observer who is both informed and reasonable. <u>Kreisner</u>, 1 F.3d at 784.

The Ninth Circuit has recognized that when the challenged government action arises in elementary school instruction, the "reasonable observer" test should take into account the

more impressionable and vulnerable nature of school-age children.  <u>Brown</u>, 27 F.3d at 1378–79.  The court rejected arguments for a subjective test, reasoning that "[i]f an Establishment Clause violation arose each time a student believed that a school practice either advanced or disapproved of a religion, school curricula would be reduced to the lowest common denominator, permitting each student to become a 'curriculum review committee' unto himself."  <u>Id.</u>  Rather, the primary effect prong of the <u>Lemon</u> test asks whether an "objective observer <u>in the position of an elementary school student</u> would perceive a message of . . . disapproval [of religion]."  <u>Brown</u>, 27 F.3d at 1379 (emphasis added).  Here, the content Plaintiffs challenge governs the sixth grade curriculum.  Compl. ¶ 29.  Thus, the Court analyzes the second <u>Lemon</u> prong from the perspective of a reasonable sixth grader.[10] <u>See</u> <u>Brown</u>, 27 F.3d at 1379.

Defendants argue that a reasonable sixth grader would consider the primary effect of the Standards and Framework to be teaching the history of ancient civilizations, not the disapproval of Hinduism.  MTD at 11.  Defendants rely on <u>Noonan</u>, which held that even "accepting plaintiff's position that the texts, in part, inaccurately and negatively depict Hinduism while simultaneously providing a more favorable depiction of Abrahamic religions," the textbooks, when viewed as a whole and as part of the overall curriculum, did not convey a message of government endorsement or disapproval of a particular religion.  <u>Id.</u> (citing <u>Noonan</u>, 600 F. Supp. 2d at 1119).

But <u>Noonan</u> adjudicated a motion for summary judgment, which involves a different standard than a motion to dismiss.  <u>See</u> <u>Usher</u>, 828 F.2d at 561 (on a motion to dismiss, a court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party").  Here, the Court must determine whether the allegations support a reasonable inference that a reasonable and informed sixth grader would consider the content of the Standards and the Framework to have a primary effect of conveying a message of disapproval of Hinduism.  At this stage of the litigation, the

---

[10]  Plaintiffs argue that applying the Lemon test from the perspective of an adult is also appropriate, because the Framework is directed at adults.  The Court disagrees.  <u>See</u> <u>Brown</u>, 27 F.3d at 1379.

Court concludes that they do.

In support of their claim that Hindu students experience pain and humiliation at the curriculum's portrayal of Hinduism, Plaintiffs quote a letter from a Hindu student that was submitted during the public comment portion of the Framework adoption process, describing her experience learning about Hinduism in the sixth grade. Compl. ¶ 85. The student's class engaged in a simulation where the students were divided into "castes," with higher caste students allowed to cheat off of students in a lower caste. Id. "By the end of the period, a majority of the class was complaining of how unfair this is, and how cruel this Hindu system was." Id. The student says, "my class was not helped to become aware and accepting of my heritage nor was I allowed to remain secure in my belief." Id. She wrote: "I do not want my friends to look down upon me and my culture and religion[.]" Id.

The primary message that sixth grade student received was that her teacher and classmates considered Hinduism "cruel," "primitive and unjust," and that Hinduism had not been treated with "fairness and dignity." Id. The student formed this impression based in large part on the Framework's content, which emphasized that the caste system was a part of Hinduism. See Framework at 42. The Framework specifically instructs teachers to "make clear to students that [the caste system] was a social and cultural structure as well as a religious belief." Compl. ¶ 81 (emphasis added). The original draft of the Framework said that the caste system was a "social and cultural structure rather than a religious belief," but the SBE changed it, allegedly at the suggestion of the SAFG. Id. ¶¶ 80–81. Plaintiffs allege that even if this revised statement is historically accurate, the heightened focus on the caste system in connection with Hinduism is "derogatory and inconsistent with . . . the treatment of other religions in the Framework." Id. ¶ 82. In the same vein, the student asks in her letter, "[w]e know that social hierarchies have existed in all societies, so why is Hinduism singled out with such [a] negative portrayal?" Id. ¶ 85.

The sixth grader who wrote this letter observed that the curriculum portrayed Hinduism, but not other religions, in a negative light—to her, the curriculum primarily communicated disapproval of Hinduism. See Brown, 27 F.3d at 1379. In light of the

15

Supreme Court's admonition that courts should be "particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools," Edwards, 482 U.S. at 583–84, the Court will infer at this point that this sixth grader is reasonable, or that a reasonable sixth grader would perceive the same message, see Usher, 828 F.2d at 561 (in evaluating a motion to dismiss, a court must draw all reasonable inferences in favor of the plaintiff). Plaintiffs have therefore stated a claim that the Standards and Framework violate the second prong of the Lemon test. Accordingly, the Court DENIES the motion to dismiss the Establishment Clause claim.

### D. Equal Protection claim

Finally, Plaintiffs allege discrimination against the Hindu religion in both (1) the content of the Standards and Framework, and (2) the Framework adoption process. Defendants argue that Plaintiffs have failed to state a claim as to both.[11]

### 1. Discrimination in the Content of the Standards and Framework

Defendants correctly argue that Ninth Circuit law forecloses an Equal Protection claim based on the content of the public school curriculum. See MTD at 12–13.

The Ninth Circuit has held that the Equal Protection Clause is not a means for challenging curriculum content decisions in public schools. See Monteiro v. Tempe Union High School Dist., 158 F.3d 1022, 1028 (9th Cir. 1998). In Monteiro, plaintiff appealed dismissal of an Equal Protection claim alleging that a school district intentionally discriminated against African-American students by requiring students to read two books that

---

[11] Defendants also argue that Plaintiffs cannot establish an Equal Protection violation because the complaint did not plead facts establishing the State's "municipal liability" for the alleged discrimination against Hinduism by employees of the CDE and members of the SBE. MTD at 16. This argument fails because the State Defendants are not a municipality, and Plaintiffs do not allege municipal liability. Monell concluded that "Congress did intend municipalities and other local government units to be included among those persons to whom § 1983 applies." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978). Its holding was "limited to local government units which are not considered part of the State for Eleventh Amendment purposes." Id. at 690 n.54.

In addition, suits against state officials in their official capacities are treated as suits against the State. Hafer v. Melo, 502 U.S. 21, 25 (1991). A plaintiff seeking injunctive relief against the State is not required to allege a named official's personal involvement in the acts or omissions constituting the alleged constitutional violation. Hartmann v. Cal. Dep't of Corr. & Rehab., 707 F.3d 1114, 1126–27 (9th Cir. 2013). Rather, a plaintiff need only identify the law or policy challenged as a constitutional violation and name the official within the entity who can appropriately respond to injunctive relief. See Hafer, 502 U.S. at 25. The Framework and Standards are the challenged official state policy here. See generally Compl.

repeatedly referred to African-Americans using a profane, racially derogatory term. Id. at 1024. The Ninth Circuit "consider[ed] whether the assignment of material deemed to have educational value by school authorities may in itself serve as the basis for an injunction," and held that the Equal Protection Clause will not support a challenge to the curriculum "even when the works are accused of being racist in whole or in part." Id. at 1028. The court explained that its holding does not preclude challenges to curriculum content decisions under the Religion Clauses of the First Amendment. Monteiro, 158 F.3d at 1028 n.6. Similarly, in Noonan, the previous lawsuit CAPEEM brought against the SBE, the court held that CAPEEM's Equal Protection claims failed "because the State has the discretion to determine the content of its curriculum, and the Equal Protection Clause does not provide a basis to challenge such curriculum decisions." Noonan, 600 F. Supp. 2d at 1111 (citing Monteiro, 158 F.3d 1022).

Plaintiffs argue that Monteiro is distinguishable because it considered the teaching of books written by third party authors, rather than state-drafted curriculum. Opp'n at 13. Not so. Monteiro addressed not only literary works written by non-state actors, but "the assignment of material deemed to have educational value by school authorities[.]" See 158 F.3d at 1028. In Monteiro, as here, school authorities made a decision to include the material in the required curriculum. See id.

Plaintiffs' Equal Protection claim based on the curriculum's content is "squarely foreclose[d]" by Monteiro. See Noonan, 600 F. Supp. 2d at 1111. No amendment to the complaint can cure this deficiency. Accordingly, the Court GRANTS the motion to dismiss with prejudice the portion of the Equal Protection claim as to the content of the Standards and Framework.

### 2. Discrimination in the Framework Adoption Process

A closer question is the Equal Protection claim as to process. The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. 14. This is "essentially a direction that all similarly situated persons should be treated alike." City of Cleburne v.

Cleburne Living Ctr., 473 U.S. 432, 439 (1985). In an Equal Protection claim, the plaintiffs must (a) show that they were treated unfavorably compared to a similarly situated group, and (b) show that the difference in treatment was based on an "impermissible motive." Freeman v. City of Santa Ana, 68 F.3d 1180, 1187 (9th Cir. 1995). Both parties have advanced arguments regarding the impermissible motive prong, but because Plaintiffs have not adequately pled the disparate treatment prong, the Court does not reach the question of motive.

Plaintiffs allege that all other religions in the Framework are treated more favorably than Hinduism, and specifically that the Abrahamic religions receive special positive treatment and endorsement. Compl. ¶¶ 75–83, 86–90. Plaintiffs claim that the Framework endorses Abrahamic religions by teaching biblical events as fact. Id. ¶ 104. As discussed in regards to the Establishment Clause claim above, this claim is implausible in light of the actual text of the Framework, which does not teach that any miraculous biblical stories are fact. See, e.g., Framework at 74 (describing the historical origins of Christianity, including the life of Jesus, without endorsing the belief that Jesus was actually a divine figure). Thus, Plaintiffs' discrimination claim as to the Framework adoption process must survive dismissal based on Hinduism being treated unfavorably, rather than Abrahamic religions being endorsed as true.

Plaintiffs plead first that the SBE disfavored Hinduism in the Framework adoption process by consulting the anti-Hindu SAFG in secret, and giving "exalted treatment" to its anti-Hindu report. Compl. ¶¶ 61, 73. These claims strain credulity. The SBE has the ability to, but is not required to, retain experts in the Framework drafting process. Id. ¶ 72. It did not retain any experts here, and announced this decision weeks before receiving any reports from the SAFG. See id. ¶¶ 48, 72. The SAFG submitted a report and suggested edits as public comments, not as an expert report. See id. ¶ 48.

Plaintiffs allege that "[u]pon information and belief, the [SBE] went to elaborate lengths to hide its consultations with secret experts only with respect to Hinduism and did not do so for its depiction of other religions." Id. ¶ 61. This conclusory statement is supported

only by allegations that one of the Defendants "evaded questions" from Hindu parents about the expert hiring process.  Id. ¶ 65.  But Plaintiffs do not plausibly plead that the SAFG was ever given special expert status or deference.  They merely note that a member of the Framework drafting commission suggested "defer[ring] to the scholars," including SAFG and its suggested edits.  Id. ¶ 74.  The SBE actually rejected four of the six examples that Plaintiffs provided of SAFG's proposed anti-Hindu edits.  Compare Compl. ¶¶ 55, 57–60, with Framework at 40–43, 142.  The Court finds it implausible that the SAFG report was given secret expert and "exalted treatment" as Plaintiffs have pled.

Next, Plaintiffs plead disparate treatment in the SBE's handling of suggested edits received from various religious groups.  Plaintiffs cite the States' Criteria for Evaluating Instructional Materials, which directs the SBE not to include language in the curriculum that is derogatory of a religion, or "examples from sacred texts or other religious literature that are derogatory, accusatory, or instill prejudice against other religions."  Id. ¶¶ 78, 91.  Plaintiffs allege that the SBE followed these guidelines and honored requests to remove derogatory language for other religions, but not for Hinduism.  Id. ¶¶ 75–83.  For example, a Jewish group requested that the state remove reference to the Good Samaritan parable in the Framework's section on Christianity, because the story "describes Jews as biased and heartless."  Id. ¶ 78.  The SBE made the requested change.  Id. ¶ 79.

Plaintiffs allege that in contrast, the SBE denied similar requests from Hindu groups.  Id. ¶¶ 75–83.  The strongest example that Plaintiffs cite is that the SBE denied their request to remove language describing the caste system as a Hindu religious belief.[12]  Id.  Plaintiffs acknowledge that this challenged statement might be historically accurate, id. ¶ 82, but contend that it puts a disproportionate emphasis on the caste system.  Plaintiffs allege that a large portion of what students learn about Hinduism "relates to an unfair societal structure that the Framework has told them is part of that religion."  Id. ¶ 100.  "For no other religion besides Hinduism does the Framework describe supposed negative beliefs of followers based

---

[12] Plaintiffs' other examples of rejected edits are less persuasive.  The SBE rejected Plaintiffs' proposal to insert flattering mention of Hinduism in the sections regarding other religions.  Compl. ¶ 90.  This does not demonstrate that the Framework is derogatory towards Hinduism.

upon the [SBE's] interpretation of religious text." Id. ¶ 101.

Plaintiffs attempt to frame the SBE's handling of suggested edits from different religious groups as a matter of process, but really what Plaintiffs object to is the curriculum decisions that allowed allegedly derogatory content into the final Framework. Such a claim is barred by Monteiro, "because the State has the discretion to determine the content of its curriculum, and the Equal Protection Clause does not provide a basis to challenge such curriculum decisions." Noonan, 600 F. Supp. 2d at 1111 (citing Monteiro, 158 F.3d at 1032). In Noonan, CAPEEM's Equal Protection claims as to the SBE's textbook adoption process survived a motion to dismiss and summary judgment, 600 F.Supp. 2d at 1113, but the process claims in Noonan were based on "certain procedural irregularities that only affected Hindu groups," such as formatting requirements and arbitrary deadlines for the public comments imposed only on Hindu groups, id. at 1111. In addition, the SBE "fully vetted Dr. Bajpai, [an expert] who supported [CAPEEM's] edits, but they did not do the same for the experts they hired who opposed the edits, and defendants imposed special requirements only on Dr. Bajpai and not on the experts opposing the edits." Id. at 1112. In the present case, there are no such allegations, just content challenges masquerading as process challenges.

The problem here is not process. The SBE invited public comments on the draft Framework, but it is not obligated to accept every suggested edit—nor could it, when faced with conflicting input. The public school system could not function if every rejected public comment on the content of curriculum carried potential liability. The Ninth Circuit recognized this when it held that the Equal Protection Clause is not a means for challenging the curriculum content decisions in public schools. See Monteiro, 158 F.3d at 1028–30. Every piece of content in the California curriculum is the result of some process. It would render the holding of Monteiro meaningless for the Court to recognize an Equal Protection process claim every time a Plaintiff pointed to objectionable content. The Court does not conclude that the content editing decisions made by the SBE in this case were either fair or unfair—only that, as the Ninth Circuit held in Monteiro, these issues are properly resolved

under the Religion Clauses of the First Amendment.  See id. at 1027 n.6.  Indeed, Plaintiffs'

Establishment Clause claim is based on the same allegedly derogatory Framework language

instructing that the caste system was a Hindu religious belief.  See Compl. ¶¶ 80–82, 85, 144.

The Court is allowing that claim to proceed.

But Plaintiffs have not pled and cannot adequately plead that the Defendants treated

Hinduism unfavorably as compared to other religions in the Framework adoption process.

Their allegations that the SBE gave "exalted" and secret expert treatment to the SAFG are

conclusory and implausible.  See Iqbal, 556 U.S. at 678.  Their allegations regarding editing

decisions go to the Framework's content, rather than the adoption process itself, and thus fail

under Monteiro.  See 158 F.3d at 1032.  Accordingly, Defendants' motion to dismiss

Plaintiffs' Equal Protection claim is GRANTED with prejudice.

## IV.     CONCLUSION

For the foregoing reasons, the Court hereby:

1.     GRANTS WITH PREJUDICE the motion to dismiss the substantive Due Process
       claim;

2.     GRANTS WITH PREJUDICE the motion to dismiss the Free Exercise claim;

3.     DENIES the motion to dismiss the Establishment Clause claim; and

4.     GRANTS WITH PREJUDICE the motion to dismiss the Equal Protection claim.

**IT IS SO ORDERED.**

Dated: July 13, 2017

CHARLES  R. BREYER
UNITED STATES DISTRICT JUDGE