IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CALIFORNIA PARENTS FOR THE
EQUALIZATION OF EDUCATIONAL
MATERIALS, ET AL.,

    Plaintiffs,

    v.

TOM TORLAKSON, et al.,

    Defendants.

Case No. 17-cv-00635-CRB

**ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT, DENYING
PLAINTIFFS' CROSS-MOTION FOR
SUMMARY JUDGMENT**

      In this case, Plaintiffs, the organization California Parents for the Equalization of

Educational Materials ("CAPEEM") and several Hindu parents, allege that the California

public school curriculum discriminates against Hindus. See generally Compl. (dkt. 1).

The sole remaining claim in the case is whether the History-Social Science Content

Standards for California Public Schools, Kindergarten Through Grade Twelve (the

"Standards"), adopted in 1998, and the History-Social Science Framework (the

"Framework"), adopted in 2016, violate the Establishment Clause of the Constitution. See

Order re MTD (dkt. 119) at 9–16, 21. In light of the Court's earlier rulings, in order to

prevail, Plaintiffs need to demonstrate that the complained-of government action has the

principal or primary effect of advancing or inhibiting religion. See Lemon v. Kurtzman,

403 U.S. 606, 612–13 (1971); Order re MTD at 10–13 (rejecting Plaintiffs' arguments

under other two Lemon prongs). The evidence does not support such a ruling.

Accordingly, as explained below, the Court GRANTS Defendants'[1] Motion for Summary

---

[1] Defendants are Tom Torlakson (State Superintendent and Director of Education), Tom Adams
(Deputy Superintendent), Stephanie Gregson (Director of the Curriculum Frameworks) and

Judgment (hereinafter "D. MSJ") (dkt. 163) and DENIES Plaintiffs' Cross-Motion for Summary Judgment (hereinafter "P. MSJ") (dkt. 215).[2]

## I.      BACKGROUND

Individual school districts decide precisely what is taught in California public school classrooms.  See Cal. Educ. Code § 60000(b) (West 2019) ("there is a need to establish broad minimum standards and general educational guidelines for the selection of instructional materials for the public schools, but . . . because of economic, geographic, physical, political, educational, and social diversity, specific choices about instructional materials need to be made at the local level"); see also id. § 60210(a) (local educational agency may use materials aligned with content standards); id. § 60618(b) (school districts may use model standard in developing district standards); see also D. MSJ Ex. 1 (dkt. 165-1) ("Standards") at 0005 ("The standards serve as the basis for statewide assessments, curriculum frameworks, and instructional materials, but methods of instructional delivery remain the responsibility of local educators.").  But state-wide materials provide the general content standards upon which the individual school districts rely.  Two such state-wide materials are at issue in this case: the Standards and the Framework.

### A.      Standards

The California legislature required the State Board of Education (SBE) to adopt model content standards in major subject areas, including history and social science.  Cal. Educ. Code §§ 60602.5(a)(1), 60605, 60618.  These Standards outline the topics and content that California public school students need to acquire at each grade level.  See Standards at 0004.  The SBE created the Standards in 1998, see Standards at 0002, and they have not changed since.

members of the California State Board of Education; Michael Kirst; Ilene Straus; Sue Burr; Bruce Holaday; Feliza I. Ortiz-Licon; Patricia Ann Rucker; Nicolasa Sandoval; Ting L. Sun; and Trish Boyd Williams, each sued in their official capacities.
[2] Because the Court finds this matter suitable for resolution without oral argument, it vacated the hearings on this motion.  See Civil Local Rule 7-1(b).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 1.    Standards Adoption Process

Notably, Plaintiffs did not include in their complaint any allegations about the standards adoption process, nor do they list the standards adoption process as a basis for their Establishment Clause claim.  <u>See</u> Compl. ¶¶ 27–42 (factual allegations about Standards, addressing only their content); <u>id.</u> ¶¶144–46 (Establishment Clause claim based on content of Standards, process of adopting Framework, and content of Framework). This is presumably because a claim based on the 1998 standards adoption process would be time-barred.  However, Plaintiffs do refer to the "[d]isfavored treatment of Hinduism in the development of the Standards" in their summary judgment motion.  <u>See</u> P. MSJ at 3. They assert that, in drafting the Standards, "[n]o apparent effort was made to obtain input from a person affiliated with a Hindu organization," unlike persons from other religious organizations, and that an Islamic group alerted the Standards Commission to language about religion "developing," yet the Commission did not apply that advice to Hinduism. <u>Id.</u> at 4–5.

On the first point, Plaintiffs rely on an unsworn article about the standards adoption process, by someone without apparent personal knowledge of the facts, which they submit for the truth of the matter, and which is therefore inadmissible hearsay.  <u>See id.</u> (citing Katon Decl. (dkt. 231-2) Ex. B (Fogo article)).  On the second point, Plaintiffs rely on a selection of documents a CAPEEM board member copied from the California State Archives, representing some proposed edits to the 1998 standards.  <u>See id.</u> (citing Kumar Decl. Ex. A (archives excerpts)).  Although Defendants object that these archive materials lack foundation and are hearsay, <u>see</u> D. Opp'n to P. MSJ (dkt. 225) at 4, the declarant sets out in his declaration the circumstances under which he copied them, <u>see</u> Kumar Decl. ¶ 9, and Plaintiffs do not truly offer them for the truth of any particular edit.  Moreover, it seems an uncontroversial proposition that these represent some fraction of the feedback the Commission received about the Standards.

Plaintiffs make clear in their reply brief that the standards adoption process is still <u>not</u> a standalone basis for their claim.  They explain: "The Standards are the violation.

3

Standards Commission actions from the past are <u>evidence</u> of the violation—not the violation itself." P. Reply re MSJ (dkt. 227) at 3. Further, they rightly quote the Ninth Circuit as observing that "reasonable observers have reasonable memories, and [the Court's] precedents sensibly forbid an observer to 'turn a blind eye to the context in which [the] policy arose.'" <u>See</u> <u>id.</u> at 4 (quoting <u>Trunk v. City of San Diego</u>, 629 F.3d 1099, 1118 (9th Cir. 2011)); <u>see also</u> <u>Capitol Square Review & Advisory Bd. v. Pinette</u>, 515 U.S. 753, 780 (1995) (O'Connor, J., concurring in part and concurring in the judgment) ("[T]he reasonable observer in the endorsement inquiry must be deemed aware of the history and context of the community and forum in which the religious display appears."). Accordingly, the Court will consider Plaintiffs' evidence and arguments about the standards adoption process for that purpose.

### 2. Standards Content

The Standards purportedly "require students not only to acquire core knowledge in history and social science, but also to develop the critical thinking skills that historians and social scientists employ to study the past and its relationship to the present." <u>Id.</u> at 0006. Plaintiffs are primarily concerned with a portion of the "Grade Six World History and Geography: Ancient Civilizations" section of the Standards, which, on half of a page, lists seven topics under the heading of "Students analyze the geographic, political, economic, religious, and social structures of the early civilizations of India." <u>See</u> P. Opp'n to D. MSJ (dkt. 216-1) at 9; P. MSJ at 13; Standards at 0032.

### B. Framework

The legislature directed the SBE to adopt model curriculum frameworks to serve as guidelines for local districts, filling in some of the historical material that corresponds to each of the Standards. <u>See</u> Cal. Educ. Code §§ 60000, 60001, 60005, 60200(c); Standards at 0006 ("The standards do not exist in isolation. The <u>History-Social Science Framework</u> will be revised to align with the standards. . . .Teachers should use these documents together."). The SBE adopted the History-Social Science Framework at issue in this case in 2016, <u>see</u> D. MSJ Ex. 2 (dkt. 165-2), and that process is part of this case, <u>see</u> Compl.

4

¶¶ 144–46.

### 1. Framework Adoption Process

The Framework adoption process began in 2008, when the SBE approved a plan to update the existing framework. D. MSJ Ex. 37–38 (dkt. 165-5); McDonald Decl. (dkt. 163-1) ¶ 2. From late March to September 2008, the California Department of Education (CDE) and SBE solicited applications for membership on a Curriculum Framework and Evaluation Criteria Committee (CFCC). McDonald Decl. ¶¶ 2–3; see also 5 C.C.R. § 9511 (allowing establishment of CFCC, setting forth composition and membership qualifications for CFCC members). The SBE received 81 applications, and, in November 2008, appointed twenty individuals to a CFCC. McDonald Decl. ¶¶ 3–5. The CFCC met for five separate two-day sessions, which were publicly noticed, open to the public, and included a period for public comment. Id. ¶ 6. It produced a draft updated framework, which the Instructional Quality Commission (IQC) voted to release to a 60-day public review and comment period. Id. ¶ 7. In July of 2009, however, citing fiscal troubles, the Governor essentially suspended all work related to the curriculum frameworks. Id.

The SBE resumed work on the framework in September of 2014, releasing a revised timeline. Id. ¶ 8. Later that month, the IQC voted to release for a 60-day public review and comment period the existing draft framework with certain CDE proposed edits. Id. During the first 60-day review period, CDE received more than 700 public comments from over 480 different commenters. Id. ¶ 9. In February 2015, Executive Director Tom Adams stated in a IQC meeting that "if funding is provided[,] CDE will contract with experts to review the proposed edits to the course description chapters as well as a professional writer to prepare new drafts." D. MSJ Ex. 62 at 1730. In August of 2015, Tom Adams emailed a member of CAPEEM, stating "the decision of whether experts are needed will be decided after the October 8–9 meeting." Kumar Decl. Ex. E (dkt. 215-1) at PLS00153.

For two days in October 2015, the IQC's History-Science Subject Matter Committee (HSS SMC) considered and heard public comment on a revised framework

draft that incorporated proposed revisions based on public comments, and forwarded it to the full IQC with additional edits discussed at the meeting. D. MSJ Exs. 65–67; Gregson Decl. ¶¶ 8–9. The HSS SMC also decided at that time not to recommend that the SBE solicit applications for content review experts to opine on the draft. D. MSJ Ex. 67 at 1774. In November 2015, a group of history professors identifying themselves as the "South Asia Faculty Group" ("SAFG") submitted a report on the draft framework, with proposed edits. Order re MTD at 3, 18; D. MSJ Ex. 18 (November 18, 2015 SAFG submission). The SAFG later submitted additional feedback. See D. MSJ Ex. 19 (February 24, 2016 letter with "extended corrections"); id. Ex. 20 (March 23, 2016 letter "to clarify some of our rejected edits"); id. Ex. 21 (May 17, 2016 letter "to register our acceptance in the main of the last round of edits"). Plaintiffs assert that Tom Adams secretly recruited the SAFG to provide feedback on Hinduism in the Framework,[3] without publicly acknowledging that he had handpicked the group to obtain a desired (anti-Hindu) viewpoint. See P. Opp'n to D. MSJ at 5–6.

After hearing public comment and accepting certain proposed edits at its November 2015 meeting, the IQC voted to recommend the resulting framework draft to the SBE, triggering another 60-day public review and comment period, between December 17, 2015 and February 29, 2016. Id. ¶ 10; Gregson Decl. (dkt. 163-3) ¶ 11 (attaching November 2015 meeting minutes), D. MSJ Ex. 68 (dkt. 165-5) at 1777–79, 1783–84. During that period, the CDE received over 10,000 e-mailed comments and thousands of additional printed comments. McDonald Decl. ¶ 10. At the March 2016 HSS SCM meeting, the committee reviewed the public comments received during the last comment period and summarized recommendations, then heard public comment from 90 individuals, and voted to recommend additional edits to the Framework. Gregson Decl. ¶¶ 12–14; D. MSJ Exs.

---

[3] Plaintiffs point to an email by an SAFG member, which states, ". . . I spoke with Tom Adams on Friday. We are asked to submit a short, concise report. . . ." See P. MSJ at 9–10. This email appears to be hearsay. See Fed. R. Evid. 801(c); Orr v. Bank of America, NT & SA, 285 F.3d 764, 783 (9th Cir. 2002) (to defeat summary judgment, opponent "must respond with more than mere hearsay and legal conclusions.") (internal quotation marks omitted).

1   69–71 (dkt. 165-5). At its May 2016 meeting, the IQC, after discussion and public

2   comment, approved a majority of those edits, and made additional changes such as

3   rejecting edits that would have replaced references to ancient India with "South Asia."

4   Gregson Decl. ¶ 15; D. MSJ Ex. 72 (IQC minutes of May 19–20, 2016 meeting) at 1801;

5   id. Ex. 73 (July 2016 CBE agenda summarizing process) at 1809; Cos Decl. ¶ 11.

6   On July 14, 2016, the SBE voted unanimously to adopt the current Framework. See

7   Cos Decl. ¶ 13; D. MSJ Ex. 75 at 1891–95.

8   ### 2.   Framework Content

9   The Framework describes itself as having "a focus on student inquiry," D. MSJ Ex.

10  2 (dkt. 165-1) ("Framework") at 0074, as encouraging students to "grapple with multiple

11  and often competing pieces of information," and as emphasizing "history as a constructed

12  narrative that is continually being reshaped," "rich with controversies and dynamic

13  personalities," id. at 0085. Although the Framework itself is over 800 pages, Framework

14  at 0070–0923, Plaintiffs are primarily concerned with a six-page portion of the Grade Six

15  Framework entitled "The Early Civilizations of India," see P. Opp'n to D. MSJ at 5; P.

16  MSJ at 16–18; Framework at 0242–47.

17  Both the Standards and the Framework address the role of several major world

18  religions in shaping history. See generally Standards; Framework; see also Framework

19  Appendix F at 0864 ("much of history, art, music, literature, and contemporary life are

20  unintelligible without an understanding of the major religious ideas and influences that

21  have shaped the world's cultures and events."). The Framework includes an Appendix

22  addressing the challenging role of religion in teaching history and social science—it quotes

23  from the First Amendment as "the hallmark of every social studies classroom," explains

24  that "public schools may not promote or inhibit religion," and directs that "religion and

25  religious convictions, as well as nonbelief" be "treated with respect. Id. at 0865. It states

26  that "[t]he school's approach to religion is academic, not devotional," that "[t]he school

27  may include study about religion as part of the history-social science curriculum, but it

28  may not sponsor the practice of religion," and that "[t]he school may educate about all

7

religions but may not promote or denigrate any religion." Id. at 0866. It also provides that "Classroom methodologies must not include religious role-playing activities or simulations or rituals or devotional acts." Id. at 0867.

Students do not read either the Standards or the Framework. Order re MTD at 2.

## C.    Procedural History

Plaintiffs brought suit in this Court in February 2017, alleging pursuant to 42 U.S.C. § 1983 (1) denial of substantive due process by interference with the liberty interest of parents to direct the education of their children; (2) violation of the Establishment Clause of the First Amendment; (3) violation of the Free Exercise Clause of the First Amendment; and (4) violation of the Equal Protection Clause of the Fourteenth Amendment. See generally Compl. Defendants moved to dismiss all claims pursuant to Federal Rule of Civil Procedure 12(b)(6). MTD (dkt. 88). The Court dismissed with prejudice Plaintiffs' substantive due process claim, Free Exercise claim, and Equal Protection claim. See Order re MTD at 21. As to Plaintiffs' Establishment Clause claim, the Court recognized that Plaintiffs could state a claim by meeting any of the three prongs of the Lemon test, but held that they failed to do so as to either the first or the third prong. See id. at 10–13. The Court held that Plaintiffs had stated a claim as to the second prong of the Lemon test, which asks whether the government action has the principal or primary effect of enhancing or inhibiting religion. Id. at 13–16. After discussing a letter quoted in the Complaint from a Hindu student who felt humiliated by a role-playing exercise about caste, the Court held:

> In light of the Supreme Court's admonition that courts should be "particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools," Edwards, 482 U.S. at 583–84, the Court will infer at this point that this sixth grader is reasonable, or that a reasonable sixth grader would perceive the same message [that the primary message from the curriculum is that Hinduism is cruel and unjust], see Usher, 828 F.2d at 561 (in evaluating a motion to dismiss, a court must draw all reasonable inferences in favor of the plaintiff).

Id. at 15–16. In so ruling, the Court distinguished California Parents for the Equalization of Educational Materials v. Noonan, 600 F. Supp. 2d 1088 (E.D. Cal. 2009), a very similar

case in which CAPEEM alleged that the 2005-2006 history-social science textbook adoption process discriminated against Hinduism, explaining that "Noonan adjudicated a motion for summary judgment, which involves a different standard than a motion to dismiss."[4]

Defendants now move for summary judgment, arguing that the Standards and Framework do not primarily communicate disapproval of Hinduism. See D. MSJ. Plaintiffs oppose Defendants' motion, and file their own cross-motion for summary judgment, arguing that the "Standards and Framework violate the Establishment Clause by denigrating Hinduism" under the second Lemon prong. See P. MSJ at 12; P. Opp'n to D. MSJ at 7.[5]

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it could affect the outcome of the case under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute of material fact is genuine if the evidence, viewed in the light most favorable to the nonmoving party, "is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On an issue on which it will have the burden of proof at trial, the moving party must affirmatively show that no reasonable jury could find other than in the moving party's favor. Id. at 331 (Brennan, J., dissenting).

---

[4] The textbooks at issue in that case were required to be aligned with the same Standards challenged here, and the Framework that directly preceded the version challenged here. See Noonan, 600 F. Supp. 2d at 1097.
[5] Defendants also object extensively to Plaintiffs' evidence. See, e.g., D. Opp'n to P. MSJ at 15–19; D. Obj. to P. Reply Ev. (dkt. 230). The Court only reaches those objections necessary to this decision.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and show that there is a genuine issue for trial.  <u>Anderson</u>, 477 U.S. at 250.  The nonmoving party does this by citing to specific parts of the materials in the record or by showing that the materials cited by the moving party do not compel a judgment in the moving party's favor.  Fed. R. Civ. P. 56(c).  Because the court has no obligation to "scour the record in search of a genuine issue of triable fact," the nonmoving party must "identify with reasonable particularity the evidence that precludes summary judgment."  <u>Kennan v. Allan</u>, 91 F.3d 1275, 1279 (9th Cir. 1996).  If the nonmoving party fails to raise a genuine issue as to any material fact, the moving party is entitled to judgment as a matter of law.  <u>Anderson</u>, 477 U.S. at 250.  In determining whether there is a genuine issue for trial, the court does not weigh the evidence, assess the credibility of witnesses, or resolve issues of fact.  <u>Id.</u> at 249.

## III.    DISCUSSION

This Order first discusses the fundamentals of Establishment Clause jurisprudence, and then the evidence in the Standards and Framework that bears on Plaintiffs' Establishment Clause claim.  It applies the facts of this case to the law, and concludes that the challenged materials do not have the primary effect of denigrating Hinduism.

### A.    Establishment Clause Jurisprudence

"The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another."  <u>Larson v. Valente</u>, 456 U.S. 228, 244 (1982).  In <u>Lemon</u>, 403 U.S. at 612–13, the Supreme Court explained that governmental action is permissible under the Establishment Clause if (1) it has a secular purpose, (2) the "principal or primary effect" neither advances nor inhibits religion, and (3) it does not foster "excessive state entanglement" with religion.  At issue in this case is the second, primary effect, prong.  That prong asks "whether it would be objectively reasonable for the government action to be construed as sending primarily a message of either endorsement or disapproval of religion."  <u>Vernon v. City of Los Angeles</u>, 27 F.3d 1385, 1398 (9th Cir. 1994).  "A government practice has the effect of impermissibly

advancing or disapproving of religion if it is 'sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by nonadherents as a disapproval, or their individual religious choices.'" Brown v. Woodland Joint Unified Sch. Dist., 27 F.3d 1373, 1378 (9th Cir. 1994).

Courts are to assess a government action's primary effect using a "reasonable observer standard." Id. at 1378. "'This hypothetical observer is informed as well as reasonable; we assume that he or she is familiar with the history of the government practice at issue.'" Id. (quoting Kreisner v. City of San Diego, 1 F.3d 775, 784 (9th Cir. 1993, cert. denied, 510 U.S. 1044 (1994)). Because the standard is objective, a particular observer's lay or expert opinion is irrelevant. See Noonan, 600 F. Supp. 2d at 1118 (rejecting use of experts in favor of hypothetical observer); Brown, 27 F.3d at 1382 (expert testimony irrelevant to primary effect test); Alvarado v. City of San Jose, 94 F.3d 1223, 1232 (9th Cir. 1996) ("reasonable observer is not an expert on esoteric [matters], nor can he or she be turned into one by any publicity generated by plaintiffs' lawsuit."). The Ninth Circuit has explained that "[i]f an Establishment Clause violation arose each time a student believed that a school practice either advanced or disapproved of a religion, school curricula would be reduced to the lowest common denominator, permitting each student to become a 'curriculum review committee' unto himself." Brown, 27 F.3d at 1379. A reasonable observer is also not aware of undisclosed intent. See McCreary Cty. v. ACLU, 545 U.S. 844, 863 (2005) ("If someone in the government hides religious motive so well that the 'objective observer, acquainted with the text, legislative history, and implementation of the statute,' cannot see it, then without something more the government does not make a divisive announcement that in itself amounts to taking religious sides.").

The Ninth Circuit has recognized that when the challenged government action arises in elementary school instruction, the "reasonable observer" test should take into account the more impressionable and vulnerable nature of school-age children. Brown, 27 F.3d at 1378–79. Courts are to be "particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools." Edwards v. Aguillard, 482

U.S. 578, 583–84 (1987). This is because younger children are more vulnerable to the "subtle coercive pressure in the elementary and secondary public schools." Lee v. Weisman, 505 U.S. 577, 592 (1992).[6] Balanced against this guidance is "the broad discretion of the school board to select its public school curriculum." See Noonan, 600 F. Supp. 2d at 1116. The Supreme Court "has long recognized that local school boards have broad discretion in the management of school affairs" and that public education "is committed to the control of state and local authorities." Bd. of Educ. v. Pico, 457 U.S. 853, 863 (1982). "Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint," and courts should only intervene if "basic constitutional values" are "directly and sharply implicate[d]." Epperson v. Arkansas, 393 U.S. 97, 104 (1968).

---

[6] In fact, Brown held that the primary effect prong of the Lemon test asks whether an "objective observer in the position of an elementary school student would perceive a message of . . . disapproval [of religion]." Brown, 27 F.3d at 1379. Based on Brown and Noonan, see 600 F. Supp. 2d at 1119 ("CAPEEM must show that an objective sixth grade student . . ."), the Court previously held that the reasonable observer in this case is the reasonable sixth grader. See Order re MTD at 14. Defendants argue that there is some authority suggesting that the Court should view the reasonable observer as an adult. See D. Reply (dkt. 223) (citing Good News Club v. Milford Sch., 533 U.S. 98, 119 (2001) ("We decline to employ Establishment Clause jurisprudence using a modified heckler's veto, in which a group's religious activity can be proscribed on the basis of what the youngest members of the audience might misperceive"); Newdow v. Rio Linda Union Sch. Dist., 597 F.3d 1007, 1037–38 (9th Cir. 2010) ("a child's understanding cannot be the basis for our constitutional analysis.")).

In Good News Club, the issue was whether the government's rejection of an organization's request to hold weekly afterschool meetings in a school cafeteria violated the Establishment Clause. 533 U.S. at 102–03. The Court held that the relevant community was the parents who would choose whether their children would attend the meetings, not the children themselves, id. at 115, and that its cases about the impressionability of school children were irrelevant because "when individuals who are not schoolteachers are giving lessons after school to children permitted to attend only with parental consent, the concerns expressed in [such cases are] not present," id. at 117. Good News Club is therefore distinguishable, because the material at issue here is the curriculum intended to be taught by public schoolteachers to schoolchildren. In Newdow, the Ninth Circuit was applying the "endorsement test," not at issue here, and it relied on Good News Club in rejecting "what a child reciting [the Pledge of Allegiance] may or may not understand about the historical significance of the words being recited." See 597 F.3d at 1037–38. The circuit explained that "some school children who are unaware of its history may perceive the phrase 'under God' in the Pledge to refer exclusively to a monotheistic God of a particular religion," but that "a reasonable observer" who was "aware of this history and origins of the words" would not. Id. at 1038.

This Court agrees that a reasonable observer would be familiar with the history of the government's practice. See Brown, 27 F.3d at 1378. Its analysis here does not depend on a child's misunderstanding, nor does it depend on whether the reasonable observer is a reasonable sixth grader or a reasonable adult.

12

### B. Evidence in the Standards and Framework

Plaintiffs identify numerous elements of the Standards and Framework that they argue demonstrate hostility toward Hinduism.[7] But even considering the evidence in the light most favorable to Plaintiffs, many of the interpretations urged by Plaintiffs are either inaccurate or incomplete. See Scott v. Harris, 550 U.S. 372, 380 (2007) (court on summary judgment need not adopt party's story when it is contradicted by the record such that no reasonable jury could believe it); T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 631–32 (9th Cir. 1987) (court need not draw unreasonable inferences).

### 1. Secular Treatment

One of Plaintiffs' chief complaints is that the Standards and Framework treat other religions as having divine origins, but discuss only the Hindu religion from a secular perspective. See P. MSJ at 16–17 (Framework "strips the Hindu belief system of any divine origins—it depicts the religion simply as a social construct."). The Court addressed a related argument at the motion to dismiss phase. Then, Plaintiffs argued that the Standards and Framework teach other religions as if they are historically accurate, and therefore endorse those religions to the exclusion of Hinduism. See Compl. ¶¶ 33, 42, 108; Opp'n to MTD (dkt. 100) at 20. The Court disagreed, holding that "the text does not support" that assertion, MTD at 10, and that "[t]he curriculum teaches the development of Judaism, not the historical accuracy of biblical stories," id. at 11. So too with Christianity. Id. The Court concluded that Defendants' purpose in enacting the challenged curriculum was "teaching the history of ancient civilizations." Id.

As evidence of Hinduism's unfairly secular treatment, Plaintiffs point to language in the Framework about Hinduism evolving or developing. See P. MSJ at 13–14 (discussing lesson that Brahmanism[8] evolved into early Hinduism); P. Opp'n to D. MSJ at

---

[7] This section discusses what the Court understands to be the most significant of Plaintiffs' concerns with the Standards and Framework. The Court necessarily holds that the other concerns not addressed here do not rise to the level of Establishment Clause violations.
[8] Plaintiffs rely on an expert, Dr. Khyati Y. Joshi, to opine about the significance of Brahmanism, and many other subjects. See P. Opp'n to D. MSJ at 9. The Court grants Defendants' objection to

2–3 (objecting to the word "developed").[9]  But the Standards and Framework also acknowledge the role of humans in the development of other religions.  See, e.g., Standards at 31 ("Discuss how Judaism survived and developed"); id. at 36 ("Trace the development of distinctive forms of Japanese Buddhism"); id. at 38 ("List the causes for the internal turmoil in and weakening of the Catholic church"); Framework at 236 ("Judaism was heavily influenced by the environment, the history of the Israelites, and their interactions with other societies."); id. at 271 ("As it became a state religion, Christianity changed. . . . The teacher points out that all religions change over time."); id. at 274–75 ("How did the religion of Christianity develop and change over time?").  Such language is consistent with the curriculum's secular purpose of teaching human history.[10]

Plaintiffs likewise contend that the Standards and Framework fail to focus on Hindus' belief in their religion's divine origins.  See P. MSJ at 14–15.  But the Framework does talk about the divine in Hinduism, even if it does not preface that discussion as Plaintiffs would prefer, by saying "According to Hindu tradition, _____."  See P. MSJ at 17–18.  The Framework states that "Ancient Hindu sages" revealed the concept "of Brahman as the divine principle of being," and as an "all-pervading divine supreme reality" that "may be manifested in many ways, including incarnation in the form of Deities."  Framework at 244.  In continues: "These Deities are worshipped as distinct personal Gods or Goddesses, such as Vishnu who preserves the world, Shiva who transforms it, and Sarasvati, the Goddess of learning."  Id.  It then describes how "[t]hese

---

Joshi's expert report.  See D. Reply at 5–7.  The report is unsworn, but more importantly, it is not relevant to the "primary effect" question.  See Fed. R. Evid. 702 (requiring testimony to be relevant to task at hand); Brown, 27 F.3d at 1382 (rejecting expert testimony as irrelevant to whether a school practice appears to endorse religion); Noonan, 600 F. Supp. 2d at 1118 (same); Alvarado, 94 F.3d at 1232 (reasonable observer not an expert).  The Court further agrees with Defendants about the failure of the Joshi Reply Declaration (dkt. 227-3) to cure the problems with the Joshi Report.  See State Defendants' Objections to Plaintiffs' Reply Evidence (dkt. 230).

[9] In their reply brief, Plaintiffs argue that what they object to is the suggestion "that human beliefs and practices evolved into the religion of Hinduism."  See P. Reply at 6–7.  The Court views this as a difference of degree and not kind.

[10] Moreover, the curriculum describes positive change in Hinduism, undermining the notion that an inflexible social hierarchy is a central Hindu belief.  See Framework at 284 ("Hinduism continued to evolve with the Bhakti movement," which "emphasized" "social and religious equality and a personal expression of devotion to God in the popular vernacular languages.").

1    teachings were transmitted orally at first, and then later in written texts, the <u>Upanishads</u>

2    and later, the <u>Bhagavad Gita</u>." <u>Id.</u>

3            Plaintiffs complain that Defendants treat the <u>Bhagavad Gita</u> as mere secular

4    literature, pointing to a line in the Standards.  <u>See</u> P. MSJ at 14 (asserting that "sacred

5    Hindu scripture, the <u>Bhagavad Gita</u>, is not described as what Hindus believe to be the word

6    of God, but as 'important aesthetic and intellectual traditions' and 'literature.'") (citing

7    Standards at 32 ("Discuss important aesthetic and intellectual traditions (e.g., Sanskrit

8    literature, including the <u>Bhagavad Gita</u>; medicine; metallurgy; and mathematics, including

9    Hindu-Arabic numerals and the zero).").  Presumably the Standards do not explain the

10   divine significance of the <u>Bhagavad Gita</u> because there are but seven bullet points covering

11   all of ancient India.  <u>See</u> Standards at 32.  The Standards are to be read in conjunction with

12   the Framework, <u>see</u> Standards at 0006, and the Framework provides a bit more context

13   about the role the <u>Bhagavad Gita</u> played, <u>see</u> Framework at 244 ("These teachings were

14   transmitted orally at first, and then later in written texts, the <u>Upanishads</u> and, later, the

15   <u>Bhagavad Gita</u>.").  However, it is unsurprising that the Framework treats the <u>Bhagavad</u>

16   <u>Gita</u> in a secular way in the context of a history curriculum—it does the same with other

17   religions' sacred texts, listing it along with the Torah, Hebrew Bible, Qur'an, and Christian

18   Bible as "classical texts" to study when one is focused on "the human experience and

19   [exploring] the various ways in which human beings affect and express their relationship

20   to their physical, intellectual, social, and political environments."  <u>See</u> Framework at 385.

21   In addition, though Plaintiffs object to the Framework's treatment of another sacred book,

22   the <u>Ramayana</u>, as a "story," P. MSJ at 18, the Framework states that that book, "the story

23   of Rama, an incarnation or avatar of Vishnu," is a "text that Hindus rely on for solutions to

24   moral dilemmas" and "one of ancient India's most important literary and religious texts."

25   <u>See</u> Framework at 246.  It does not use the word "story" in a dismissive sense, but calls the

26   book "important."  <u>See</u> <u>id.</u>

27           **2.      Caste System**

28           Another of Plaintiffs' primary complaints about the Standards and Framework is

                                                    15

their over-emphasis on the caste system. See P. MSJ at 16 ("the Framework's enormous focus on caste within its coverage of Hinduism is itself contemptuous and unlike the treatment of any other faith."). The Standards include, under the heading "Students analyze the geographic, political, economic, religious, and social structures of the early civilizations of India," the bullet point "Outline the social structure of the caste system," Standards at 32, and the Framework expressly connects the caste system to Hinduism, stating, "Teachers should make clear to students that [the caste system] was a social and cultural structure as well as a religious belief," Framework at 246. Plaintiffs do not maintain that it is historically inaccurate to link the caste system to Hinduism; rather, they argue that the curriculum's spotlight on caste gives students an unfairly negative view of Hinduism.[11] See Compl. ¶ 82 ("Many would argue that caste was not and is not a Hindu belief. But irrespective of the accuracy of the language, it is certainly derogatory and inconsistent with . . . the treatment of other religions in the Framework."); see also P. Reply at 7 ("highly debatable" whether "caste is a Hindu religious belief"). Plaintiffs also contend that the Framework "fails to note that the caste system has existed in India among Sikhs, Christians, Muslims and Buddhists, but not among Hindus of Indonesia and Fiji." P. MSJ at 18 (citing what appears to be an inadmissible article about the caste system).

While it is true that the Framework does not contain the mitigating language Plaintiffs seek, it contains other mitigating language, which makes clear that the caste system existed in a historical context and was not unique to ancient India. See, e.g.,

---

[11] Plaintiffs assert that "By word count, 47 percent of the Framework's discussion in sixth grade of Hinduism supporting individuals, rulers and societies is on caste." See P. MSJ at 16, n.21 (citing to dkt. 172-4, a color coded version of the Framework purporting to depict negative, neutral and positive treatment of Hinduism); see also id. at 16 ("71 percent is negative by word count, while only 6 percent is positive"). Defendants rightly note that Plaintiffs rely on this word counting system without any explanation of its methodology or creator. See D. Reply at 2. The document Plaintiffs point to, an attachment to a proposed amended complaint that the Court disallowed, see dkt. 172-1 ¶ 158, is incredibly subjective and of no use to the Court on summary judgment. For example, Plaintiffs have inexplicably highlighted in red, indicating a negative portrayal of Hindus, the sentences "Ancient India experienced a Vedic period (ca. 1500–500 BCE), named for the Vedas, which were composed in Sanskrit," dkt. 172-4 at 162, and "Later in the Vedic period, new royal and commercial towns arose along the Ganges (aka Ganga), India's second great river system," id. at 163.

Framework at 245 ("As in all early civilizations, Indian society witnessed the development of a system of social classes."); id. ("This system, often termed caste, provided social stability and gave an identity to each community."); id. ("Over the centuries, the Indian social structure became more rigid, though perhaps not more inflexible than the class divisions in other ancient civilizations."); id. at 246 ("Today many Hindus, in India and in the United States, do not identify themselves as belonging to a caste.");[12] id. ("As in Mesopotamia and Egypt, priests, rulers, and other elites used religion to justify the social hierarchy."). This language goes a long way to contextualize and soften the subject of caste.

Plaintiffs point next to a textbook entitled Discovery Education, Discovery Education Social Science Techbook, Grades Six Through Eight, which Plaintiffs assert includes an exercise for role playing the caste system. See P. Opp'n to D. MSJ at 3–4 (citing Kumar Decl. (dkt. 215-1) at PLS00184–87). Plaintiffs add that the book includes a lesson objective directing teachers to "Connect the beliefs of Hinduism to the caste system and other elements of ancient Indian life." Id. at 4 (citing Kumar Decl. (dkt. 215-1) at PLS00201). This evidence is misleading. First, Discovery Education appears to have been adopted as part of the November 2017 instructional materials adoption, see Pl. Admin. Mot. (dkt. 196) Ex. 5 ("2017 History-Social Science Adoption Report")—a process that Plaintiffs do not challenge in their complaint, and which involves a different regulatory process than those pertaining to framework adoption. See D. Reply at 11 (citing 5 C.C.R. §§ 9511–9526). While the book is slightly relevant in that it demonstrates a local district's interpretation of the Standards and Framework, it is not Defendants' creation. More importantly, the role playing exercise is aimed at teachers, not students, and it does not mention Hinduism or even the caste system. See Kumar Decl. at PLS00186–87 ("Announce to the class that society in ancient India gave different people different levels of opportunity, much like this activity."; "Next, post the Essential Question: What effects

---

[12] But see P. Opp'n to D. MSJ at 13 (opining that this sentence "is patronizing and implies that the caste system is inherently Hindu.").

did power and social class have on the lives of the ancient Indian people?"; "Encourage them to think about the impact that money and power may have had on their social standing, or position, within Indian society."). The "Lesson Overview" that Plaintiffs tout as linking "the beliefs of Hinduism to the caste system and other elements of ancient Indian life" actually relates to another lesson (lesson 6.3), not the lesson containing the role playing exercise (lesson 6.2). See id. at PLS00201.

Moreover, even if the book was a part of this case and even if it explicitly directed students to participate in a caste system role playing exercise, that is not the kind of role playing that the Framework itself forbids and that courts view with great suspicion. It does not involve the role playing of a devotional act, like taking communion, but rather of a historical social system. See Framework Appendix F at 867 ("Classroom methodologies must not include religious role-playing activities or simulations of rituals or devotional acts."); Brown, 27 F.3d at 1380 ("active participation in 'ritual' poses a greater risk of violating the Establishment Clause than does merely reading, discussing or thinking about religious texts"); but see id. n.6 ("a reenactment of the Last Supper or a Passover dinner might be permissible if presented for historical or cultural purposes.").[13]

Finally, on the subject of role-playing, this Court's order at the motion to dismiss phase discussed an allegation in the Complaint that the "Commission was made acutely aware of the pain and humiliation the curriculum's portrayal of Hinduism inflicts on Hindu students," through the letter of a sixth grade student about a caste role-playing exercise in her classroom two years earlier. See Order re MTD at 15–16; Compl. ¶ 85. Although one individual's opinion is not controlling given the objective nature of the reasonable observer test, see Brown, 27 F.3d at 1379, the Court stated that, because it was adjudicating a motion to dismiss, it would "infer at this point that this sixth grader is reasonable, or that a reasonable sixth grader would perceive the same message." Order re MTD at 16.

---

[13] Because the Court rejects Plaintiffs' interpretation of the "intricate role-playing exercise of the caste system," the Court also rejects Plaintiffs' argument that a reasonable observer would recognize that that exercise selectively violated California law. See P. MSJ at 20–23.

18

Defendants accurately note, however, that (1) the exercise apparently took place two years before the Framework at issue was adopted,[14] see Compl. ¶ 85 ("two years prior" to adoption process); (2) the specific instructional method described was employed at the local level and was not required by the Framework; and (3) the exercise was arguably contrary to the guidance in the (subsequently adopted) Framework, see Framework Appendix F ("Classroom methodologies must not include religious role-playing activities"). See D. MSJ at 3.[15]

### 3.    Aryan Invasion

Plaintiffs also object to the Standards and Framework's treatment of the Aryan Invasion Theory, which Plaintiffs claim, citing the expert report that the Court has rejected herein, is a "long-ago debunked, Orientalist theory" that "present-day India and Pakistan were invaded, in approximately 1500 BCE, by the 'Aryans,' a tribe of European origin, and that the Aryans . . . became the creators of Hindu civilization." P. MSJ at 15 (citing Joshi Report at 4). The Standards do state "Discuss the significance of the Aryan invasions," see Standards at 32, but they must be read together with the Framework, see Cal. Educ. Code §§ 60000, 60001, 60005, 60200(c); Standards at 0006. The Framework does not use the term "Aryan Invasion." It states that, in the Vedic period (between 1500 and 500 BCE), "according to many scholars, people speaking Indic languages, which are part of the larger Indo-European family of languages, entered South Asia, probably by way of Iran." Framework at 243–44. It continues, "Gradually, Indic languages, including Sanskrit, spread across northern India." Id. at 244. After another couple of sentences

---

[14] Plaintiffs' argument that "the offensive language of the current Framework proclaiming that caste is a religious belief . . . is virtually identical to the 2005 version of the Framework that was in force when the student was treated so cruelly," P. Opp'n to D. MSJ at 18, fails to note that the 2005 version of the Framework was in effect when Defendants adopted the instructional materials upheld in Noonan, see Noonan, 600 F. Supp. 2d at 1097.
[15] The Court does not rely on Defendants' additional argument that Plaintiffs are making a facial challenge and so the law presumes that local districts will implement the curriculum legally, see id., as Plaintiffs contest this point, see P. Opp'n to D. MSJ at 19 ("Although the Standards and Framework violate the Establishment Clause on their face, Plaintiffs never limited their claim to a facial challenge"); but see, e.g., Stipulation (dkt. 90) ¶ 1 (Plaintiffs stipulating that individual school districts "are not necessary parties in the determination of the constitutional claims in the action.").

1  about language, the Framework states: "Another point of view suggests that the language

2  was indigenous to India and spread northward." Id.

3      This discussion about how different languages developed and spread in ancient

4  India is simply not, as Plaintiffs assert, an assertion that "The origin of Hinduism . . . is the

5  Aryan Invasion Theory." See P. Opp'n to D. MSJ at 5; see also P. MSJ at 17 ("The origins

6  of all other religions included in the Framework are explained from the perspective of the

7  believer. . . . Only for the origin of Hinduism does the Framework use a discredited

8  theory."). It takes an expert opinion, not relevant to this Court's inquiry, to make it so.

9  See P. MSJ at 15 (citing Joshi Report at 4); Alvarado, 94 F.3d at 1232 (reasonable

10 observer not an expert). As to Hinduism's origin, the Framework actually discusses

11 archeological finds from the earlier Harappan civilization (about 2600 to 1900 BCE), as

12 containing artifacts that "show features that are all present in modern Hinduism, such as a

13 male figure that resembles the Hindu God Shiva in a meditating posture, as well as small

14 clay figures in the posture of the traditional Hindu greeting namaste." See Framework at

15 243.

16      Having set aside the unfounded contention that the Framework teaches the Aryan

17 Invasion as the origin of Hinduism, what is left is the language itself about migration and

18 language. It is not clear whether Plaintiffs are disputing that in the Vedic period, people

19 who spoke Indic languages entered South Asia. See P. Reply at 7 ("The Framework

20 Reference to 'Indic speakers' . . . is synonymous with the . . . discredited Aryan Invasion

21 Theory."). Even if that is their contention, the Framework alerts students to a competing

22 historical theory. See id. at 244 ("Another point of view suggests. . .").[16] The Court is no

23 _____

24 [16] In fact, in a recently-adopted textbook submitted as an exhibit in connection with an earlier
   motion, the Aryan migration is treated thusly: "According to many historians, around 1500 B.C,

25 waves of new people began crossing the Hindu Kush into India. The migrants were a collection of
   tribes called Aryans, meaning 'noble ones.' They belonged to the Indo-European people who had

26 populated central Asia. (Some scholars have begun to dispute this theory, however. They believe
   that the Aryans were descendants of earlier Indus civilizations and there was no invasion or

27 migration at all.)." See Prouty Decl. Ex. A (dkt. 183-2) at 148.
       One note about the textbook excerpts submitted in this case. As discussed above,

28 Plaintiffs' complaint does not challenge the recently-adopted textbooks or the 2017 instructional
   materials adoption process of November 2017. See generally Compl. And the Court recognizes

1    authority on ancient Indian history and in no position to declare one version true and the

2    other false.  This language deals with history—contested history, but history all the same.

3    Whether or not there was an influx of Aryans into South Asia in 1500 BCE is

4    appropriately the subject of a history and social science curriculum, and not actually a

5    positive or negative statement about Hinduism.

6                    **4.    Treatment of Women**

7         Plaintiffs also object to the Framework's description of Hinduism as contributing to

8    the unequal status of women.  See P. MSJ at 19–20.  They assert that it deliberately treats

9    Hinduism "as a contributor to patriarchy while not making the same acknowledgment for

10   other religions."  Id. at 19.  Not so.  The Framework reflects that patriarchy was not unique

11   to ancient India or Hinduism.

12        The relevant language in the Framework is about ancient India, not Hinduism.  It

13   states, "Although ancient India was a patriarchy, women had a right to their personal

14   wealth, especially jewelry, gold, and silvery, but little property rights when compared to

15   men, akin to other ancient kingdoms and societies."  Framework at 246.  It continues,

16   "They participated in religious ceremonies and festival celebrations, though not as equals.

17   Hinduism is the only major religion in which God is worshipped in female as well as male

18   form."  Id.  About Judaism, the Framework states: "Judaism, in its ancient form, was

19   largely a patriarchy.  It was rare for women to own property, but Jewish law offered

20   women some important rights and protections."  Id. at 236.  About Christianity, it

21   provides: "Although ancient Christianity was a patriarchy and all the apostles were men,

22   several women were prominent, especially Mary, mother of Jesus.  Until modern times,

23

24   that a different regulatory process governs the instructional materials adoption process than the
     curriculum framework adoptions.  See 5 C.C.R. §§ 9511–26.  However, the recently-adopted
25   textbooks are slightly relevant to the Court's assessment of the Standards and Framework, as they
     demonstrate that someone has determined that those books are aligned with the Standards and
26   Framework at issue in this case.  On the other hand, excerpts of old instructional materials were
     aligned with a different Framework.  Thus, the pages attached to the Nair Declaration (dkt. 215-7),
27   purporting to be assignments given to the declarant's daughter by local educators during the 2016–
     17 school year, and which would not have been aligned with the 2016 Framework or the 2017
28   instructional materials adoption, are essentially irrelevant.  They also lack foundation.  The Court
     therefore sustains Defendants' objection as to that evidence.  See D. Opp'n to P. MSJ at 17.

1    Christian women had few property rights and were subordinate to men." Id. at 270; see

2    also id. at 240 (about ancient Athens: "women, foreigners, and slaves were excluded from

3    all political participation."); id. at 231 ("Mesopotamia was a patriarchy and men had more

4    power than women.").

5         Plaintiffs' contrary reading of the Framework is misleading. Compare P. MSJ at 19

6    ("For Christianity, the Framework even provides that 'male clergy, both Catholic and

7    Protestant,' generally agreed that 'men and women are equal in the sight of God.'") with

8    Framework at 313 ("In a few radical Protestant sects, women sometimes became leaders in

9    church organizations and propagation. However, male clergy, both Catholic and

10   Protestant, generally agreed that even though men and women are equal in the sight of

11   God, women should bow to the will of their fathers and husbands in religious and

12   intellectual matters."). While the Framework does not include Plaintiffs' desired

13   "interpretations of the Bible that would give women a status inferior to men," see P. MSJ

14   at 19, it certainly blames Christian leaders for some historical gender inequality, see

15   Framework at 313.

16        **5.      Additional Negative and Positive Treatment of Religion**

17        Beyond the language already discussed herein, the Framework frequently

18   acknowledges negative aspects of other religions' histories. For example, the Framework

19   states that Muslim leaders conquered new land and forced some non-Muslims to convert.

20   Id. at 278. It mentions that "Christians and Muslims enslaved captives who did not belong

21   to their own religions." Id. at 310. It notes "extensive" criticism of the Catholic Church

22   over the selling of indulgences and corruption by the clergy. Id. at 312. In explains that

23   "Protestantism added more fuel to the already growing religious persecution in Spain,

24   which had expelled the Jews in 1492. Between 1500 and 1614, Spain expelled all

25   Muslims and persecuted converts and dissenters in the Spanish Inquisition." Id. It notes

26   that Galileo Galilei "was charged with heresy by the Catholic Church for his public

27   support of Copernicus' theory that the earth revolved around the sun" and "spent his final

28   days under house arrest." Id. at 316.

United States District Court
Northern District of California

The Framework also uses positive language about Hinduism and ancient India. It describes the Harappan civilization (about 2600 to 1900 BCE) as "well planned" and "[a] flourishing urban civilization." Id. at 243. It describes the Vedic period as "build[ing] up a rich body of spiritual and moral teachings that form a key foundation of Hinduism as it is practiced today." Id. at 244. It describes "the central practices of Hinduism today" as including "above all, a profound acceptance of religious diversity." Id. at 245. And it ends by discussing the Ramayana as an "epic work." Id. at 246. It contains positive language about the Gupta Dynasty (280 to 550 CE), as "a rich period of religious, socioeconomic, educational, literary, and scientific development," and discusses the "[e]nduring contributions from the cultures of which is now modern India and other parts of South Asia." Id. at 283. It addresses the Chola Empire, which was "associated with significant artistic achievement," and states that "Hinduism continued to evolve with the Bhakti movement," which "emphasized" "social and religious equality and a personal expression of devotion to God." Id. at 284.

### 6. The SAFG

Finally, Plaintiffs vociferously object to the role of the SAFG, the group of academics that they claim Tom Adams secretly recruited to provide anti-Hindu input on the Framework. See P. MSJ at 9–11 (". . . presented the feedback to the public without acknowledging that Adams handpicked the professors . . . to obtain the viewpoint he sought."); P. Opp'n to D. MSJ at 5–6 (same); P. Reply at 3 ("Defendants gave special consideration to the [SAFG] solicited by the [CDE] officials").[17] Although the SAFG participated "outside of the expert appointment process," see P. MSJ at 9; see also Compl. ¶¶ 48–51 (alleging that Defendants "chose to ignore completely the process for consulting experts contemplated by the Department of Education's regulations"), Tom Adams stated that it was undecided "whether experts are needed," see Kumar Decl. Ex. E at PLS00153,

---

[17] Plaintiffs also complain that two members of the SAFG were actually authors of the Framework. See P. Reply at 6. But this fact makes it even less objectionable for the CDE to consult them.

23

United States District Court
Northern District of California

a CFCC with Content Review Experts had already been formed in 2008, see McDonald Decl. ¶¶ 2–5; 5 C.C.R. § 9511, and it is not clear that the regulations would have permitted a second CFCC.  As previously noted, the email Plaintiffs rely on to establish that Tom Adams was directing the SAFG contributions is hearsay.  See P. MSJ at 9–10.  But assuming that the CDE indeed solicited the SAFG's input, there is no evidence that it did so pursuant to official state policy, see Dougherty v. City of Covina, 654 F.3d 892, 900 (9th Cir. 2011), or that a reasonable observer would be cognizant of the academics' internal correspondence, see Viswewaran Decl. ¶ 15 (dkt. 151-2) (third party communications have always been private, and no one else had access to them); see also McCreary, 545 U.S. at 863 (reasonable observer not aware of hidden religious motive).

Moreover, it is not at all clear that the nefarious gloss that Plaintiffs urge on the SAFG's correspondence is borne out.  See Corley Order (dkt. 171) at 12–13 (description of correspondence as partisan and anti-Hindu "is contradicted by the context and overall content of the messages.").  As one example of this, Plaintiffs highlight a single line in an email from an SAFG member, stating "readers of our report can imagine that it is meant to undermine the legitimacy of Hinduism as a religion (and Hinduism uniquely among religions, at that.)."  See P. Opp'n to D. MSJ at 14 (quoting Katon Decl. Ex. D at KEN00047).  A review of the complete document reveals that the author of that line was objecting to mention of an academic debate that the author felt was too complicated and subject to misinterpretation.  See Katon Decl. at KEN00047.  The author continued, "Our critics should not be able to say that we show animus against Hinduism, or against religion generally and so dismiss our suggestions as partisan.  We should acknowledge that Hinduism will of course play a major role in textbooks on Indian civilization, but not at the expense of acknowledging other religions and the multiplicity within Hinduism itself."  Id.  The email as a whole does not suggest that the author is seeking to undermine the legitimacy of Hinduism, and the single line that Plaintiffs quote is misleading.

As a second example of SAFG correspondence taken out of context, Plaintiffs quote an email that they assert shows that SAFG members "understood that they were to use

'smoke and mirrors' to manipulate the Framework adoption process." See P. MSJ at 23

(quoting Katon Decl. at KEN00016); P. Opp'n to D. MSJ at 14 (same). But that email

simply stated that the group was not going to respond directly to a particular Hindu

organization (Hindu American Foundation),

> . . . but we need to describe what we take to be the social/scientific/scholarly current consensus on these issues, and then state whether we think the framework is consistent with that scholarly consensus. So that is our mission: to clearly state what is accepted scholarship, and if there is no legitimate debate on an issue, to state this unambiguously.

See Katon Decl. at KEN00016. Far from revealing that the author/group intended to

surreptitiously insert into the curriculum either false or anti-Hindu materials, the email

shows that the author/group's stated intention was to make the Framework more accurate.

Equally important, the SAFG made their positions known via public comment,

which Defendants made available for public review. See McDonald Decl. ¶¶ 9, 11.

Although Plaintiffs object to the CDE's failure to disclose Adams's role, they do

acknowledge CDE's open use of the SAFG recommendations. See P. MSJ at 10

("Although Adams' recruitment of the handpicked SAFG was never made public,

McTygue, who led the drafting of the Framework, did state publicly for the first time at the

final History-Social Science Subcommittee meeting in March 24, 2016 that the

subcommittee had been receiving reports from the SAFG."). Moreover, the CDE rejected

a number of the SAFG's recommendations. Of the six examples the Complaint identifies

of the SAFG's allegedly anti-Hindu recommendations, the Court has already noted that

"[t]he SBE actually rejected four." See Order re MTD at 19 (dismissing Equal Protection

claim based on Framework Adoption process). In addition, Defendants submit evidence

that there was significant support for SAFG's positions.[18]

---

[18] See, e.g., D. MSJ at 16–18 (citing, among other things, Appendix (dkt. 165) Ex. 22 (letter signed by 153 individuals, mostly American professors, expressing "support for the recommendations of the South Asia Faculty Group," including recommendations concerned with "sanitization of the connection of caste to Hinduism"); Appendix Ex. 23 (letter submitted by Dalit Bahujan Faculty Group, 21 scholars in United States and India, that "broadly supported SAFG's proposed edits," and asserted "consensus among historians, that a society divided into caste . . .

As to edits generally, the Court previously rejected Plaintiffs' arguments that Defendants favored other religions over Hinduism in accepting and rejecting feedback on the Framework.  See id.at 20–21 ("The problem here is not process.  The SBE invited public comments on the draft Framework, but it is not obligated to accept every suggested edit—nor could it, when faced with conflicting input.  The public school system could not function if every rejected public comment on the content of the curriculum carried potential liability. . . . Plaintiffs have not pled and cannot adequately plead that the Defendants treated Hinduism unfavorably as compared to other religions in the Framework adoption process.").  It now rejects Plaintiffs' strained argument that a reasonable observer would recognize that Defendants' handling of edits selectively violated California law.  See P. MSJ at 21–23.  The reasonable observer is not a legal expert, nor, given these facts, would he or she reach the conclusion Plaintiffs urge.  The CDE received over 10,000 emailed comments, and thousands of additional printed comments in just one phase of the Framework adoption process.  See McDonald Decl. ¶ 10.  It is no wonder that the "Supreme Court has warned that courts should not be in the position of analyzing the minutia of textbook edits and curriculum decisions."  See Noonan, 600 F. Supp. 2d at 1121.

## C.  Primary Effect

A reasonable observer would not view the Standards and Framework as primarily denigrating Hinduism.

---

was advocated as the ideal in texts as old as Rig Vega . . ."); Appendix Ex. 24 (submission from South Asian Histories for All, stating among other things that "Caste as determined by birth has been religiously sanctioned and a lived reality in India for thousands of years.  Erasing the religious underpinnings of caste also negates the religious dissent that produced the Buddhist, Ravidassia, and Sikh religions."); Appendix Ex. 25 (letter from Council on American-Islamic Relations urging SBE to accept the SAFG's edits and expressing concern about proposed edits "that seek to deny the reality of the [caste] system"); Appendix Ex. 27 (letter from Society for Advancing the History of South Asia, affiliate organization of the American Historical Association, supporting the "SAFG mission of including mention of caste . . . as concept[] for understanding the history of society and culture in ancient India, and the history of Hinduism itself.")).  The Court also understands, of course, that Plaintiffs and others opposed SAFG's positions.  See, e.g., P. Opp'n to D. MSJ at 22 n.24 (quoting from Hindu American Foundation and Hindu Education Foundation press releases).

26

### 1. Disapproval of Religion

As discussed above, many of the examples Plaintiffs give of disparagement are not that. The Framework discusses other religions' development as a result of human influence; it includes mitigating language about caste, stating that there was a system of social classes in all early civilizations; it recognizes a competing theory to the theory that Indic speakers entered South Asia in the Vedic period; and it states that patriarchy was not unique to ancient India. An objective, reasonable observer would find much of the challenged material entirely unobjectionable. See Alvarado, 94 F.3d at 1232 ("reasonable observer is not an expert on esoteric [matters]. . . ."); Books v. Elkhart County, Indiana, 401 F.3d 857, 867 (7th Cir. 2005) (effect "is evaluated against an objective, reasonable person standard, not from the standpoint of the hypersensitive or easily offended.").

But even if there is some evidence by which a reasonable person could infer a disapproval of Hindu religious beliefs—an excessive discussion of caste, for example, or a failure to be fully transparent about coordination with SAFG—that is not enough to conclude that the primary message of the Standards and Framework is disparagement. See C.F. v. Capistrano Unified Sch. Dist., 654 F.3d 975, 985–86 (9th Cir. 2011) ("Even statements exhibiting some hostility to religion do not violate the Establishment Clause if the government conduct at issue," in addition to meeting the other two Lemon prongs, "does not have as its principal or primary effect inhibiting religion."). Two cases about state disapproval of religion illustrate this point.

In Vernon, 27 F.3d at 1388–89, the City of Los Angeles conducted an investigation into whether an Assistant Chief of Police's religious beliefs were "improperly shaping the operations and policies" of the police department. The officer sued the City, alleging, among other things, an Establishment Clause violation. Id. at 1390. Although the district court held that there was "no evidence in the record from which a reasonable person could infer any disapproval by the city," the circuit observed that the city's having "expressly included within the scope of its investigation inquiries concerning 'consultation with religious elders on issues of public policy' suggests that the city disapproved of such

consultation," and that such disapproval could "possibly [be] due to the particular religious beliefs underlying such consultation." Id. at 1398.  The circuit explained, however, that "[n]otwithstanding the fact that one may infer possible city disapproval of Vernon's religious beliefs from the direction of the investigation, this cannot objectively be construed as the primary focus or effect of the investigation." Id. at 1398–99.  The primary purpose of the investigation was to investigate whether the officer was engaging in improper or illegal conduct, and the investigation could not "reasonably be construed to send as its primary message the disapproval of [the officer's] religious beliefs." Id. at 1399.  The circuit noted, too, that there were "prominent disclaimers" in the course of the investigation about the officer's entitlement to his personal religious views.  Id.

Similarly, in American Family Association v. City and County of San Francisco, 277 F.3d 1114, 1122 (9th Cir. 2002), where the San Francisco Board of Supervisors sent a letter and adopted resolutions denouncing discrimination and violence against members of the LGBTQ community, the Ninth Circuit held that two of the "documents contain certain statements from which it may be inferred that the Defendants are hostile towards the religious view that homosexuality is sinful or immoral."  "Nonetheless," the circuit continued, "we believe the district court properly concluded that this was not the principal effect of Defendants' actions." Id.  It explained: "The documents, read in context as a whole, are primarily geared toward promoting equality for gays and discouraging violence against them." Id.  Even though the two documents "may contain over-generalizations about the Religious Right," or "misconstrue the Plaintiffs' message," "a reasonable, objective observer would view the primary effect of these documents as encouraging equal rights for gays and discouraging hate crimes, and any statements from which disapproval can be inferred only incidental and ancillary." Id. at 1122–23.

Here, as in Vernon and American Family, even if a reasonable observer could infer some disapproval of historical aspects of Hinduism, the Standards and Framework by no means primarily communicate disapproval of Hinduism.  Just as the primary effect of the investigation in Vernon was to investigate possible illegal conduct, and the primary effect

of the Board of Supervisors' actions in <u>American Family</u> was to encourage equal rights and denounce hate crimes, the primary effect of the Standards and Framework is to establish a curriculum on ancient history and social sciences.  <u>See</u> Standards at 0006 (requiring "students not only to acquire core knowledge in history and social science, but also to develop the critical thinking skills that historians and social scientists employ to study the past and its relationship to the present."); Framework at 0074 (ensuring "that all California students are prepared for college, twenty-first century careers, and citizenship.").  In addition, here, as in <u>Vernon</u>, there are disclaimers.  The Framework's Appendix quotes from the First Amendment, explains that "public schools may not promote or inhibit religion," and directs that "religion and religious convictions, as well as nonbelief" be "treated with respect."  Framework at 0865.  And, as discussed above, the body of the Framework specifically makes positive references to ancient India and Hinduism, along with negative references to other civilizations and religions.

While Plaintiffs concede that they must demonstrate that the government's action sends "primarily a message of . . . disapproval," P. Opp'n to D. MSJ at 7 (quoting <u>Vernon</u>, 27 F.3d at 1398), they quote <u>Brown</u>, 27 F.3d at 1378, for the proposition that the "concept of a 'primary' effect encompasses even nominally 'secondary' effects of government action that directly and immediately advance, or disapprove of, religion," P. Opp'n to D. MSJ at 8.  They also cite to <u>Vasquez v. Los Angeles Cty.</u>, 487 F.3d 1246, 1256 (9th Cir. 2007) (quoting <u>Brown</u>, 27 F.3d at 1378), which held that "Governmental action has the primary effect of advancing or disapproving religion if it is 'sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices."  <u>Id.</u>  They argue that "[a]pplying the correct standard," they would prevail, because "it is sufficiently likely that a reasonable observer would perceive" that the Standards and Framework "disapprove of Hinduism."  <u>Id.</u>

But <u>Brown</u>, which this Court relies on extensively, pre-dates <u>Vernon</u> and <u>American Family</u>.  Moreover, <u>Vasquez</u> actually stated that "The most instructive cases in our circuit

are <u>Vernon</u> and <u>American Family</u>," 487 F.3d at 1256, and its application of the second <u>Lemon</u> prong is consistent with those cases, <u>see id.</u> at 1257 ("a 'reasonable observer' familiar with the history and controversy . . . would not perceive the primary effect of Defendants' action as one of hostility towards religion."). Indeed, while Plaintiffs accurately quote <u>Vasquez</u>, <u>Vasquez</u> inaccurately cites to <u>Brown</u>—the quoted language from <u>Brown</u> was defining the word "effect," not the concept of "primary effect." <u>Compare Brown</u>, 27 F.3d at 1378 ("A government practice has the effect . . . if it is 'sufficiently likely to be perceived'") <u>with</u> <u>Vasquez</u>, 487 F.3d at 1256 ("Government action has the primary effect . . . if it is 'sufficiently likely to be perceived'").

Plaintiffs' interpretation would read the word "primary" out of the primary effect test and render any conceivable disapproval a constitutional violation. That is not the law. Certainly courts cannot ignore "nominally 'secondary' effects of government action that directly and immediately advance, or disapprove of, religion." <u>See</u> <u>Brown</u>, 27 F.3d at 1378. But Plaintiffs must still show that disapproval of Hinduism is the primary effect of the Standards and Framework, and they have not done so.

### 2. The Context of School Curriculums

It was not enough in <u>Vernon</u> and <u>American Family</u> that there was some disapproval of religion: the context of the government action was essential in assessing the primary effect. Context is also essential to the Ninth Circuit's treatment of school curriculum cases. Courts are to "consider the . . . curriculum as a whole to determine whether the primary effect is to endorse or inhibit religion." <u>Noonan</u>, 600 F. Supp. 2d at 1118 (quoting <u>Grove v. Mead Sch. Dist. No. 354</u>, 753 F.2d 1528, 1540 (9th Cir. 1985) (Canby, J., concurring) ("Objectivity in education need not inhere in each individual item studied; if that were the requirement, precious little would be left to read.")); <u>cf.</u> <u>Fleischfresser v. Dirs. of Sch. Dist. 200</u>, 15 F.3d 680, 689 (7th Cir. 1994) (courts are to "focus on the entire series, not simply the passages the parents find offensive because to '[f]ocus exclusively on the religious component of any activity would invariably lead to its invalidation.'"). Disparagement of Hinduism is not the primary effect of the Standards and Framework as a

whole.  A couple of school curriculum cases are particularly helpful in demonstrating this.

In <u>Grove</u>, 753 F.2d at 1531, parents brought suit over a school board's refusal to remove a book called <u>The Learning Tree</u> from their daughter's sophomore English literature curriculum.  The parents argued that <u>The Learning Tree</u> "has a primary effect of inhibiting their religion, fundamentalist Christianity, and advancing the religion of secular humanism."  <u>Id.</u> at 1534.  The Ninth Circuit disagreed, explaining that while the Establishment Clause prohibits "daily readings from the Bible," "recitation of the Lord's Prayer," "posting the Ten Commandments in every classroom," "beginning school assemblies with prayer," and including in a meditation course "a ceremony involving offerings to a deity," the "literary or historic study of the Bible is <u>not</u> a prohibited religious activity" and "[n]ot all mention of religion is prohibited in public schools."  <u>Id.</u>  Reading <u>The Learning Tree</u> was "not a ritual" but an exploration of the "expectations and orientations of Black Americans."  <u>Id.</u>  Moreover, the book "was included in a group of religiously neutral books in a review of English literature, as a comment on an American subculture."  <u>Id.</u>; <u>see also</u> <u>id.</u> at 1540 (Canby, J., concurring) ("It is one book, only tangentially 'religious,' thematically grouped with others in the sophomore literature curriculum.").  Accordingly, the school board did not violate the Establishment Clause.

Likewise, in <u>Brown</u>, 27 F.3d at 1377, parents objected to a district's use of <u>Impressions</u>, an elementary school teaching aid that consisted of "approximately 10,000 literary selections and suggested classroom activities," covering "a broad range of North American cultures and traditions."  <u>Id.</u>  The plaintiffs challenged 32 of the selections, which directed students to discuss witches, create poetic chants, and pretend that they were witches or sorcerers.  <u>Id.</u>  They alleged that the selections promoted the religion of Wicca and the practice of witchcraft.  <u>Id.</u>  The Ninth Circuit explained that "[t]o the extent that the Challenged Selections involve no more than merely reading, discussing or contemplating witches, their behavior, or witchcraft, they fall squarely within the holding of <u>Grove</u>."  <u>Id.</u> at 1380.  The circuit also rejected the plaintiffs' role-playing arguments, concluding that this was not "student participation in school-sponsored religious ritual" but

United States District Court
Northern District of California

"coincidental resemblance . . . to witchcraft ritual." Id. at 1380–81. It continued, "As in Grove, the Challenged Selections are only a very small part of an otherwise clearly nonreligious program. It thus is unlikely that . . . an objective observer would perceive the inclusion of the selections in Impressions as an endorsement of or disapproval of religion." Id. at 1381. The court reiterated: "The context in which the Challenged Selections exist is relevant to determining whether children will have such a perception." Id. The plaintiffs therefore failed to meet the second Lemon prong. Id. at 1383.

Much like The Learning Tree was only one book "included in a group of religiously neutral books in a review of English literature," see Grove, 753 F.2d at 1534, and the witchcraft selections were only 32 of 10,000 literary selections, see Brown, 27 F.3d at 1377, the language Plaintiffs object to in the Standards and the Framework are only a small part of an expansive history and social sciences curriculum, ranging from kindergarten to twelfth grade and from ancient history to economics and principles of American democracy. See Framework at 72–73; see also Noonan, 600 F. Supp. 2d at 1119 (challenged materials "are only a small portion of otherwise clearly nonreligious texts. . . which are part of a clearly[] nonreligious history-social sciences program.").

This is not to say that truly derogatory language accounting for only a small percentage of words in a larger text would never qualify as a "nominally 'secondary' effect[] of government action that directly and immediately advance[d], or disapprove[d] of, religion." See Brown, 27 F.3d at 1378. The Court holds only that, as discussed above, the materials Plaintiffs challenge in this case do not so qualify. Relatedly, although Plaintiffs object to perceived bias in the Standards and Framework development process— particularly in connection with the role of the SAFG, see P. MSJ at 9–11—that process involved public review, public comment, and public meetings, and the curriculum that resulted from that process does not primarily disparage Hinduism. In context, the process does not alone satisfy the second Lemon prong.

Ultimately, "the State of California has determined that students should study the importance of religion . . . to gain a better understanding of different cultures and

32

1  conflicts." <u>Noonan</u>, 600 F. Supp. 2d at 1117; Framework Appendix F at 0864 ("much of

2  history, art, music, literature, and contemporary life are unintelligible without an

3  understanding of the major religious ideas and influences that have shaped the world's

4  cultures and events."). "Not all mention of religion is prohibited in public schools."

5  <u>Grove</u>, 753 F.2d at 1534; <u>see also</u> <u>Stone v. Graham</u>, 449 U.S. 39, 42 (1980) ("the Bible

6  may constitutionally be used in an appropriate study of history, civilization, ethics,

7  comparative religion, or the like"); <u>Sch. Dist. of Abington Twp. v. Schempp</u>, 374 U.S. 203,

8  225 (1963) ("it might well be said that one's education is not complete without a study of .

9  . . the history of religion and its relationship to the advancement of civilization."). As in

10 <u>Grove</u> and <u>Brown</u>, the challenged material here is not school-sponsored religious ritual.

11 <u>See</u> <u>Grove</u>, 753 F.2d at 1534; <u>Brown</u>, 27 F.3d at 1380–81. It is a discussion of ancient

12 India that includes a discussion of early Hinduism from an historical perspective. <u>See also</u>

13 <u>Noonan</u>, 600 F. Supp. 2d at 1121 (material does not "serve as a religious primer."). This is

14 constitutionally permissible, as "[t]he Establishment Clause is not violated when

15 government teaches about the historical role of religion." <u>See</u> <u>Books</u>, 401 F.3d at 868.

16      Given the substance and context of the challenged materials, a reasonable observer

17 would not conclude that the primary effect of the Standards and Framework is the

18 disparagement of Hinduism. A reasonable observer would conclude that their primary

19 effect is to establish a curriculum on ancient history and social sciences. Accordingly,

20 Plaintiffs' challenge fails the second prong of the <u>Lemon</u> test. Defendants' actions did not

21 violate the Establishment Clause.

22 **IV. CONCLUSION**

23      For the forgoing reasons, the Court GRANTS Defendants' Motion for Summary

24 Judgment and DENIES Plaintiffs' Cross-Motion for Summary Judgment.

25      **IT IS SO ORDERED.**

26      Dated: February 28, 2019

27                           CHARLES R. BREYER
                           United States District Judge

28